MICHELS *v.* WESTERN UNDERWRITERS' ASS'N.

SAME *v.* TRANSATLANTIC FIRE-INSURANCE CO.

SAME *v.* PRUSSIAN NATIONAL FIRE-INSURANCE CO.

SAME *v.* INTERNATIONAL INSURANCE CO.

129　417
f146 ³235

1. ARBITRATION—BILL TO SET ASIDE AWARD—PARTIES.
    In a suit to set aside an arbitrators' award under fire-insurance policies, all of the insurance companies that were parties to the arbitration agreement are necessary parties.

2. EQUITY PRACTICE—NONJOINDER OF PARTIES—DEMURRER.
    A nonjoinder of necessary parties to a bill in chancery, disclosed on the face of the bill, can only be taken advantage of by demurrer.

3. EVIDENCE—MATTERS WITHIN KNOWLEDGE OF DECEDENT.
    The fact that a conversation to which a person is disqualified from testifying under the statute (3 Comp. Laws, § 10212), because of the death of the other party, was had in the presence of a third person, does not remove the bar of the statute.

4. EQUITY PRACTICE—HEARING IN OPEN COURT—EVIDENCE.
    A circuit judge is not bound, on the hearing of a chancery case, to admit evidence which the statute declares shall be inadmissible.

5 INSURANCE—ARBITRATION—VALIDITY OF AGREEMENT OF SUB-
    MISSION
    Insurance policies held by complainants provided for the sub-
    129 MICH.—27.

mission of any loss under them to arbitrators, whose award should be *prima facie* evidence of the amount of the loss. After a fire, complainants entered into a written agreement with the insurance companies for arbitration, which provided that the award should be binding upon both parties as to the amount of the loss. It appeared that the agreement, which was very short, was in the possession of complainants long enough for them to have read it before they signed it, and there was testimony that they did read it. No mistake was claimed, nor any actual fraud shown. *Held*, that the agreement was not invalid in that its effect was not explained to complainants.

6. EQUITY PRACTICE—PROVINCE OF COURT.

A court of equity, in passing on questions of fact, should not submit its conscience to what a jury might do under like circumstances.

7. EQUITY JURISDICTION—ARBITRATION—SETTING ASIDE AWARD.

Courts of equity alone have the power to determine whether an award under an arbitration agreement was corruptly or fraudulently made.

8. FIRE INSURANCE—ARBITRATION—VALIDITY OF AWARD—REFUSAL OF HEARING.

In a suit against insurance companies to set aside an arbitrators' award, complainants testified that they offered to show the arbitrators where certain planer patterns, as to the loss of which some question had been raised, were, and their condition, and that the arbitrators promised to look at them the next morning. Such patterns were on the schedule of property lost and damaged furnished to the appraisers. They had examined the damaged property, were on the premises frequently for several days, and found all the property except the patterns. No demand for sworn testimony or an open hearing was made. *Held*, that the failure of the arbitrators to look at the patterns after being informed where they were was not such a refusal to give the parties a hearing as would justify the setting aside of the award.

9. SAME—METHOD OF APPRAISAL.

The arbitrators to whom was submitted the adjustment of the loss sustained under a fire policy covering certain machine patterns allowed nothing for absolutely "dead" patterns, but allowed something for those for which there might possibly be a use. *Held*, that this method of estimating the loss was within the terms of the submission, authorizing them to make a proper deduction for depreciation from use, age, condition, location, or otherwise.

10. Same—Inadequacy of Award.

Arbitrators chosen to adjust a loss under a fire policy fixed the loss, under oath, at $740. Two appraisers employed by the insured, who made their examination some time after that of the arbitrators, and under less favorable circumstances, estimated the loss at $7,000. The property lost and damaged consisted chiefly of machinery patterns, the value of which depended on whether the machines for which they were made were in common use, or whether they were " dead patterns." *Held*, not to show that the award was so inadequate as to warrant an inference of corruption or partiality on the part of the arbitrators.

Appeal from Wayne; Frazer, J. Submitted January 7, 1902. Decided February 11, 1902.

Bills by Jacob Michels, Harry Michels, and Fred J. Bresee, copartners as J. Michels & Co., against the Western Underwriters' Association and others, to set aside an arbitrators' award under certain fire policies. The cases were consolidated and heard as one, and a decree entered for complainants. Defendants appeal. Reversed.

Complainants were for many years prior to March, 1899, manufacturers of woodworking machinery, and conducted a general machine shop. At that time the defendant companies insured their property, consisting of machinery, machine patterns, stock, fixtures, etc. Some of their property (chiefly the patterns) was damaged by fire on June 21, 1899, and it is claimed that some were totally destroyed. Upon receiving notice of the loss, the defendants sent their adjusters, who were unable to agree with the complainants as to the amount of the loss. The policies were of the Michigan standard form. In them was a provision that, in case of disagreement as to the amount of loss, the same should be ascertained by two competent and disinterested appraisers, each party to the contract to select one, and the two so chosen to select an umpire. The appraisers were then to estimate and appraise the loss, stating separately sound value and damage, and, on failing to agree, to submit their differences to the umpire.

The award in writing of any two was to be *prima facie* evidence of the amount of the loss.  The property covered consisted of eight items, the two principal ones being the machinery, etc., used in manufacturing, insured for $1,770, and patterns and materials for the same, insured for $3,000.

An agreement of submission was executed June 28, 1899. It provided that the award should be binding upon both parties as to the amount of the loss.  It further provided that, in determining the sound value and the loss or damage upon the property, the appraisers should estimate the ''actual cash cost of replacing or repairing the same, or the actual cash value thereof, at and immediately preceding the time of the fire, and, in case of depreciation of the property from use, age, condition, location, or otherwise, a proper deduction should be made therefor.''  The loss was claimed upon four items mentioned in the articles of submission, viz.:  (1) Stock of manufactured machinery, insured for $500;  (2) engines, etc.;  (3)  patterns and materials for same;  (4)  office and shop furniture, etc., insured for $270.

Complainants selected as their appraiser one Charles M. Caryl, a man 70 years of age, and of experience in the value of property such as was covered by the insurance. The defendants selected one Douglas, of Chicago, about 60 years of age, also a man of experience in such matters. The complainants and their foreman took the appraisers over the scene of the fire; furnished them a list of the property, which they used in checking up the property damaged or destroyed, showed them that which was damaged, and explained the damages.  The award was made June 30th.  The loss and damage were found as follows:

| | |
|---|---:|
| On stock of manufactured machinery | $66 00 |
| On machinery, belting, etc. | 50 00 |
| On patterns | 594 75 |
| On office fixtures, etc. | 30 00 |
| Total | $740 75 |

The complainants ignored the award, and brought suit against each of the defendants upon the policies, claiming damages of $4,416.30. To these suits pleas were interposed setting up the appraisal and award as final and binding. One of the suits came on for trial, and the court held, when the facts were developed, that the award was binding, and could only be set aside in a court of chancery. A juror was then withdrawn, and complainants then brought suit in chancery against each of these defendants to set aside the award. Upon objection being made to the first suit in equity, when brought on for hearing, that the other insurance companies, parties to that award, should be made parties in the same suit, the court ordered all the cases to be consolidated and heard as one. The grounds set up in the bill for setting aside the award are:

1. That the agreement to submit to arbitration was not in accordance with the terms of the policy; that it was "false and fraudulent; was not, in fact, agreed to by your orators, and was imposed upon them by fraud, and by taking advantage of your orators' lack of knowledge of their rights, and of the particular terms of said agreement for submission."

2. That the award "was false, fraudulent, corrupt, and void, because the amount was grossly disproportionate to the actual loss; because the appraisers did not conduct their investigations judiciously, honestly, fairly, or impartially; because they held no regular sessions at which parties might be heard; because they refused to hear evidence or statements which complainants desired to make; because they appointed a time and place for listening to proofs, and then executed and signed said award without awaiting the time so appointed; because said appraisers undertook to decide that certain items of personal property, claimed to have been destroyed by fire, were not in the fire, and were not damaged or destroyed by said fire."

Proofs were taken in open court, and the award set aside, because: (1) The submission was not in accordance with the terms of the policy; and (2) that the method adopted in the determination of the amount of loss by the appraisers was not such as was contemplated by the terms of the submission.

*Maybury & Lucking,* for complainants.

*Moore & Goff,* for defendants.

GRANT, J. (*after stating the facts*). 1. It was insisted upon the hearing in the court below that all the insurance companies who were parties to the arbitration should have been made parties to one suit brought to set it aside, and that, therefore, the bill should be dismissed for lack of indispensable parties. The contention is sound, and, if this objection had not been waived, it should prevail. The learned circuit judge recognized the rule, but held that the same object could be accomplished by a consolidation of the cases. Whether that opinion be sound we need not determine. The bill set up all the facts in regard to the agreement of submission, and showed that all the companies now defendant were parties to that submission. The necessity of such parties, therefore, appeared upon the face of the bill, and, under the holding in *Powers* v. *Hibbard,* 114 Mich. 533 (72 N. W. 339), this objection should have been raised by demurrer. It was too late to raise it upon the hearing.

2. Complainants were permitted to testify to conversations with one Smitha, who was the agent and general adjuster for the defendants. Smitha had died long before the hearing. A third party was present at those conversations. Counsel for complainants admit that the testimony should have been excluded under section 10212, 3 Comp. Laws, prohibiting parties from testifying to facts equally within the knowledge of the deceased, if a third party had not been present. The admission of such testimony would be in plain violation of the statute. The third person is the only one competent to testify to what passed between the parties, one of whom is dead. This was expressly decided in *Taylor* v. *Bunker,* 68 Mich. 258 (36 N. W. 66). Although this is a chancery case, the circuit judge was under no obligation to admit such evidence, and should have excluded it.

3. It is next urged that complainants are not in position

to raise the question of fraud in procuring the submission contrary to the terms of the policy, because their letters and those of their attorneys made no such claim, and no such claim was made until the bill was filed. Several authorities are cited which seem to support this proposition, but it is unnecessary to pass upon it. The contract of submission can be set aside only for fraud or mistake. We find no evidence of fraud on the part of the agents of the defendants who executed it, and no mistake is claimed. The agreement was very short, and both complainants had it in their possession and signed it. Aside from the description of the property on which the loss was to be determined, it does not fill a page of the record, and entire it fills only two pages. Both appraisers, who were disinterested, and one Loeb, an adjuster for the defendants, testified that complainants read it. They had ample opportunity to read it, and it was their own fault if they did not. The only basis for setting aside the submission is that the complainants did not choose to read it, but supposed it was in accordance with the policy. Mr. Michels testified that he knew there was a provision for arbitration, but did not know its terms. Contracts cannot be set aside simply because one of the parties thereto did not choose to read them over. If complainants had prepared the submission, and submitted it to the defendants for their approval and execution, and the defendants had been dissatisfied with the award and complainants satisfied, would these defendants be permitted to say, "The award is fraudulent, because our agents signed it without choosing to read it?" A contract of submission between an insurer and its insured is governed by the same rules as a similar contract between any other parties. The circuit judge found there was no actual fraud, but that there was a legal fraud upon the complainants, in that they were not informed by defendants of the effect of the agreement. Where the effect of the contract is so patent upon its face that any layman can understand it, there is no occasion for either party to inform the other of its effect. This precise question, under

a state of facts very similar, and under a Michigan standard policy, was raised in *Montgomery* v. *Insurance Co.*, 108 Wis. 146 (84 N. W. 175). The agreement for submission is almost identical with this. It made the award binding and conclusive. The court, speaking through Chief Justice Cassoday, said:

"In the absence of fraud or mistake, Mollie Montgomery was conclusively presumed to know the contents of the appraisal agreements, and must be deemed to have entered into such agreements understandingly."

The contract of submission must be held valid.

4. The circuit judge, in a written opinion, said, "I have no reason to think there was any corruption on the part of the appraisers." We thoroughly agree with this conclusion. They were experienced men; had no interest in the matter; and spent between two and three days in the examination of the property, listening to the statements of the complainants and their foreman, and in making up their award; were furnished a list of the property which complainants claimed was lost and damaged, and made such an examination and investigation as they deemed necessary to pass upon the matters submitted to them. They were under oath. Complainants naturally chose their appraiser from Detroit. The defendants naturally chose a man from the outside. Both acted honestly. The charge made by complainants and their counsel that the appraiser Mr. Caryl, chosen by them, "sold them out," is unjust, and has no foundation whatever. Mr. Caryl may have been mistaken in judgment, but there is nothing in the record worthy of belief to impeach his honesty, or to show that he was improperly controlled in his judgment by his co-appraiser. Neither is there anything to show that Mr. Douglas did not act honestly, and according to his best judgment. He had frequently been employed, both by insurers and insured, in services of this character. In order to convict men of untruthfulness, dishonorable and corrupt conduct, courts must be able to find some convincing evidence in the record. The learned counsel for

the complainants in their brief assert, " We believe no jury could be found that would not declare from the evidence that this was a corrupt and partial award." A court of equity cannot abdicate its duty or submit its conscience to what a jury might do in any case, not even that of an individual against a corporation. Under the Constitution and laws of this State, a court of law is not the proper forum to determine whether an award under an arbitration, agreed to by the parties thereto, was corruptly and fraudulently made. Courts of equity alone are clothed with the power to set them aside. The learned counsel recognized this rule in withdrawing a juror and commencing proceedings in equity. The contention that this award should be set aside as fraudulent and corrupt fails.

5. Counsel urge that the appraisal must be set aside because the appraisers refused a proper hearing to the complainants. This claim is based upon the testimony of Mr. Michels that, on the evening of the 30th of June, he went to Mr. Caryl's house to talk with him about the award,—a proceeding of at least doubtful propriety. He testified :

"I told him I understood there was a question on their part whether the patterns we claimed were burned were in that vault, and I came up to tell him that, if he would bring Douglas down in the morning, I would show the patterns, and that their condition was badly burned; that they were no good. He said, 'All right, we will be down early in the morning.'"

Mr. Caryl denies this conversation.

Mr. Bresee testified that Friday (the 30th) afternoon, about half past 4, he went to the Russell House, and saw Mr. Douglas; that the question had arisen as to whether two large planer patterns were in the vault; that Bresee told him he thought he could furnish him evidence—some parts—to show him that they were there; that Douglas replied he wished he would, and wished he would be down in the morning about 10 o'clock. Bresee testified that he reported this conversation to Michels, and this offered the occasion for Michels' visit to Caryl.

It was a matter of no great importance whether these patterns were in the vault or not. They were on the schedule of property lost and damaged furnished by complainants to the appraisers. The appraisers had examined the damaged property, and were upon the premises two or three times a day for two or three days. No demand for sworn testimony or for an open hearing was made by either party to the submission. It was evidently not contemplated; at least neither had demanded it. The appraisers found the remains of nearly everything except the two large planer patterns. The insurance companies left the appraisers to go to the scene of the fire, view the property, and take whatever statements they chose from the complainants. There was no such refusal to give the parties a hearing as, under the authorities, justifies the setting aside of the award.

6. Complainants insist that a wrong method of estimating the loss was adopted, and that the award is void for that reason; citing *Dodds* v. *Hakes*, 114 N. Y. 260 (21 N. E. 398); *Laurent* v. *Insurance Co.*, 1 Hall, 45; *Washington Mills Emery Manfg. Co.* v. *Insurance Co.*, 135 Mass. 503; *McCuaig* v. *Insurance Co.*, 18 U. C. Q. B. 130. Those cases are little in point. *Washington Mills Emery Manfg. Co.* v. *Insurance Co.* is as favorable to complainants' contention as any. In that case a grantor of land sold the land, reserving a building, to be removed by a day named, and, if not removed within the time, it was to go to the grantee of the land. Before the expiration of the time for the removal, it was destroyed by fire. The insurance company maintained that the value of the property must be measured by its value for removal, and not by its intrinsic value as it stood upon the land. The court, of course, held the measure of damages to be its value as it stood upon the land. In this case the appraisers exercised their judgment upon the intrinsic value of the property. The submission provided that, in determining the sound value and the loss or damage, the appraisers should estimate the actual cash cost of replacing or

repairing the same, or the actual cash value thereof; "*and, in case of depreciation of the property from use, age, condition, location, or otherwise, a proper deduction shall be made.*" Many patterns become what are called "dead" patterns. These are useless, and of no value. Complainants testified that they threw out every year wagon loads of them. They had a fire in November preceding, in which they recovered for loss of patterns the full amount of insurance, $3,000, lacking $22. The most of, if not all, the patterns for which they now seek recovery were then in existence, and in the building at the time of the fire. Many of them were 10 and 12 years old; many others older. Some were patterns of machines no longer manufactured. There might possibly be an occasion to use some of these old patterns. In fixing the loss the appraisers took these things into account. They allowed nothing for absolutely "dead" patterns, but allowed something for those for which there might possibly be a use. We think this was within the terms of the submission, authorizing them to make a proper deduction for depreciation by use, age, condition, location, or otherwise. *Radley* v. *Seider,* 99 Mich. 433 (58 N. W. 366).

7. Counsel also insist that the award should be set aside for its gross inadequacy; citing authorities which hold that, where the assessment is so erroneous or exorbitant as to induce a belief that the arbitrators were corrupt or grossly partial, it should be set aside. Complainants make no case for the application of this rule. Appraisals were made by others subsequent to that under the submission, and, as one of them testified, he depended largely upon what the complainants told him as to the property and its condition. They did not have that opportunity for personal examination that Caryl and Douglas had: Such a finding must, of necessity, be based upon the adoption by the court of the estimates subsequently made by persons employed by complainants and by their own testimony. We must, therefore, in order to so find, take their opinions

as true, and hold Caryl and Douglas, disinterested parties, acting under oath, as being corrupt or grossly partial. The record will not justify us in coming to that conclusion. Evidently the learned circuit judge could not adopt such a conclusion, after seeing the witnesses for the respective parties.

Complainants' counsel, in their brief, claim a loss for their clients, under the proofs, of $6,987.30. They also say that Weiss and Goring, two witnesses employed by complainants to examine the patterns, "estimated the loss on patterns to be $5,571." I find no testimony in the record to sustain this statement. Neither Weiss nor Goring testified to the amount of damages made by them, except by reference to their schedule, known as "Exhibit Z2," in the record. This schedule does not pretend to show the loss on patterns. There is a column headed "Sound Value," and another, "Loss." There are no figures whatever in the column "Loss," while the column "Sound Value" figures up $6,904. There is another part of the schedule without any heading or anything to explain what it means. The dollars column foots up $408.

But, if their testimony were as stated, there is no reason in saying that it was not as much too large as that of Caryl and Douglas was too small. Nor is there any reason for saying that the judgment of the former was better than the judgment of the latter. If Weiss and Goring had been chosen by the parties as appraisers, and had made an award to the full extent of the loss now claimed by the complainants, and if defendants had then employed Caryl and Douglas to make an appraisal, and they had fixed the damage at $740, would their conclusion as to the value show that the appraisal of Weiss and Goring was grossly excessive, so as to stamp the award as fraudulent and void? None of the machinery was destroyed. It was only damaged by water, and this damage was caused mainly by rust. The damage by rust would be greater the longer the machinery stood uncleaned. The patterns of a foundry and machine shop have no market value.

Their value depends upon their condition, the use to which they can be put, and whether the machines for which they are made are in common use, or whether they are what is known as "dead" patterns.   It is one of those cases where honest appraisers may honestly differ, and where prejudiced appraisers would be likely to fix amounts according to the wishes of their employer.   In such cases the only safe rule is to sustain that appraisal to which the parties have agreed, especially when such appraisal is under oath, and made at a time when the damages can be most justly appraised.

The decree is reversed, and the bills dismissed.

HOOKER, C. J., MOORE and MONTGOMERY, JJ., concurred.   LONG, J., did not sit.