Metz *v.* Travelers Fire Insurance Company,
Appellant.

Argued October 1, 1946. Before MAXEY, C. J., DREW,
LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*John B. Brooks*, with him *Brooks, Curtze & Silin*, for appellant.

*Frank B. Quinn*, with him *Engish, Quinn, Leemhuis & Plate*, for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, November 25, 1946:

This proceeding was an action of assumpsit on a policy of insurance. The original fire insurance policy was extended "to include direct loss by windstorm, hail, explosion, riot, riot attending a strike, civil commotion, aircraft, vehicles, and smoke". Plaintiff alleged that at approximately 5:00 A.M. (Eastern War Time) the building covered by this policy was damaged by windstorm and that by reason thereof forty feet of the terminal warehouse building covered by this policy was blown down and that "attendant to the falling of said wall about sixty (60) feet of the roof of the building was demolished". Damages of $6200. were claimed.

The affidavit of defense averred that whatever damage "was done to the building referred to was done because of an excessive fall of snow which lodging upon the roof of the said building caused it to collapse". This raised an issue of fact as to the cause of the collapse of the warehouse.

The case was submitted to a jury and a verdict returned in favor of the plaintiff for $6200, plus interest from May 2, 1945. The court below refused to grant either a new trial or to enter judgment n. o. v. This appeal followed.

The First Assignment of Error relates to the admission of the testimony of J. J. Ladig as an expert in estimating the velocity of wind. Ladig testified that he was a truck driver residing at Conneaut, Ohio, and that on January 24, 1945, he was in the city of Erie. He was asked: "Have you had any experience in testing the

velocity of wind". He answered: "I am an expert rifleman from the army and, being such, we had to be able to test the wind to know how to be able to figure the trajectory of a bullet". He was asked: "How did you ascertain the velocity in the army?" He answered: "At that time, the first time I was in, we had a flag which if it had a rigid, extended position it was too high to fire. If it was anything less than that we had to figure accordingly. But in the tropics we had a meter which would tell us the approximate velocity of the wind." He said the meter was at the firing line.

He stated that from 8:00 o'clock in the evening the night of January 23, 1945, until 6:00 o'clock the next morning he was at the terminal inside the building in question. He observed: "The south wall was weaving and dust from the mortar between the bricks was falling, and there was small chunks of the bricks coming out falling inside the building due to the weaving of the wall from the wind." He said the wall swayed anywhere from 2 to 4 inches according to the velocity of the wind. He was then asked: "What would you say was the rate per mile of this wind at two o'clock when you described it?" The testimony was objected to on the ground that the witness was not qualified to answer the question. The objection was overruled. He was then examined further as to his experience in the army and he said: "We found while firing, especially while firing for a record, we had no flag; you fired as of experience, and we had to judge the wind and be able to judge it. The wind at that time was between 30 and 50 miles an hour." That was at 2:00 o'clock. He was then asked to be more specific and he answered: "Well, it was right around approximately between 40 and 45; about 42 miles an hour is what the wind was blowing, enough that I wouldn't fire a rifle in it with any accuracy."

Experts in judging the speed of automobiles are plentiful; experts in judging the speed of wind may

exist but they are rare. Witness Ladig's answers to the questions put to him did not furnish persuasive proof that he was an expert in judging wind velocity. During his three years service in the army it was a meter which told him at times "the approximate velocity of the wind". At other times he "had to judge the wind" with the aid of a flag. His bare statement as to the velocity of the wind had little or no probative value. However, he testified to the "swaying" effect of the wind on the building. If he was an observer of the building while the wind was blowing against it at 5:00 A.M. January 24, 1945, his testimony as to what he observed was competent. Its credibility and its weight were for the jury. His further statement that the wind had a velocity of from between thirty and fifty miles an hour and which he later made more specific when he said it had a velocity of forty-two miles an hour, added little or nothing to the force of his testimony as to the "weaving" or "swaying" of the wall because of the wind. We therefore cannot hold that the admission of his testimony as to the velocity of the wind was prejudicial error. There was in this case other evidence of a much more persuasive character than Ladig's "expert" testimony (if that other evidence was believed) that a wind of great force was blowing against the insured building on the morning it collapsed. This evidence is herein later referred to.

The Second Assignment of Error is based on the allegation that the court did not emphasize sufficiently the testimony of the Director of the United States Weather Bureau as to the velocity of the wind. The court in its charge referred to the fact that George Wickham, the Official Weather Observer for the City of Erie, testified that the records of his office showed that on January 24, 1945, the velocity of the wind at the observatory between one and two o'clock in the morning was fifteen miles an hour; that between two and three o'clock in the morning the wind velocity was fourteen

miles an hour; and between five and six o'clock in the morning the wind velocity was fifteen miles an hour. We think this was ample reference to the Official Observer's testimony. There was no necessity as alleged by the appellant for the court to *compare* the testimony of Ladig with that of the Observer. It is a jury's function to compare conflicting testimony.

The Third Assignment of Error was based upon the fact that the court did not confine the plaintiff's recovery of damages to an amount which it would have cost to repair or replace the damages with the material of the same kind and quality. The insurance policy involved in this suit provides in part as follows: That the insurance is "to the extent of the actual cash value (ascertained with proper deductions for depreciation) of the property at the time of loss and damage, but not exceeding the amount which it would cost to repair or replace the same with material of like kind and quality within a reasonable time after such loss or damage . . .". It was testified to at the trial that it was impossible to obtain material of like kind and quality for replacement of the building and it became necessary for the insured in the replacement of the building to use steel columns for supporting the roof. Appellee testified that he actually spent or will be obliged to expend the sum of $7,978.67.

This court said in *Fedas, Appellant, v. Insurance Company of the State of Pennsylvania,* 300 Pa. 555, at 562, 563:

"Actual cash value in a policy of insurance means what it would cost to replace a building or a chattel as of the date of the fire [or loss] . . . If part of the building destroyed cannot be replaced with material of like kind and quality, then it should be substantially duplicated within the meaning of the policy." See also *Patriotic Order Sons of America Hall Association, Appellant, v. Hartford Fire Insurance Company,* 305 Pa. 107.

The Fourth Assignment of Error is based on the court's refusal of a new trial. The Fifth Assignment of Error is based on the court's refusal to enter judgment for the defendant n. o. v. The pleadings and evidence in this case raised an issue of fact for the jury. There was ample evidence to sustain plaintiff's claim that 40 feet of the east wall of the insured building was blown down by a wind storm and that attendant to the falling of said wall about sixty feet of the roof of the building was demolished.

Theodore Stossmeister testified for the plaintiff that he was general manager of the transportation company owned by the plaintiff. He testified that: "A section of the roof and the trusses was blown down and the bricks from the east wall were thrown into the building to the east". He testified that the wind also ripped planks off the roof. He also said that he "measured a part of the roof that collapsed and one piece that still remained, and on the part that collapsed and was down there more or less intact there was 4 inches of ice and 11 inches of snow". The purport of his testimony on his point was that the structure was strong enough to sustain this weight. Henry P. Amthor, who was in the construction business, testified that the roof of the insured building "was built strong enough to withstand any snow load that we might have in this area". Harold Stokes, who is employed by the transportation company owned by the plaintiff, testified that on the night in question between midnight and 5:00 A.M. he "noticed shaking in the wall, the bricks beginning to drop out . . . ; that the wall was weaving with the wind about four inches". Samuel A. Ladig testified that on the morning in question he observed "the front wall of the terminal building weave back and forth". He described the character of the wind as "intermittently violent".

Elmer Coleman, a structural engineer and graduate of Rensselaer Polytechnic Institute, and a registered engineer of the State of New York, testified in answer to a hypothetical question, that the damage which was done to the insured building was done by the force of the wind. Hugh M. Nelson, a structural engineer for over 30 years and graduate of Allegheny College and University of Nebraska, testified in answer to a hypothetical question: "I would say without doubt it [the collapse] was caused by the wind."

It was testified by Ben Anderson, who was an insurance adjuster for the defendant Fire Insurance Company, that he visited the premises after its collapse and found a section of the building had fallen onto a truck and the trailer and that in the part of the building or the roof remaining there was seven inches of ice and about 36 inches of snow. That was on the part of the roof immediately adjacent to "the break". Harry B. Joyce, a mechanical and electrical engineer, testified that he made an investigation of the building and that it was his opinion that the wind could not have caused the damage; that the damage was caused by pressure from above which caused the supports to give way and let the roof down.

The court in its charge to the jury made it clear that the burden of proof was on the plaintiff to show by a fair preponderance of the credible evidence that the building was damaged by a windstorm. The court said: "If the jury find from all the evidence that the damage to this building was not caused directly by windstorm but was actually caused by the weight of snow and ice which may have accumulated on the roof of the building, then your verdict should be for the defendant."

Under the evidence in this case the court would not have been warranted in directing the jury to return a verdict for the defendant or in entering judgment for the defendant n. o. v.

The Sixth Assignment of Error is based on the charge of the jury on the measure of damages. What we have said in our discussion of the Third Assignment of Error is applicable here. The court's charge on the question of damages was free from error. The charge followed the decisions of this court in many cases, including the cases above cited.

All the Assignments of Error are overruled. The judgment is affirmed.