MUNN *v.* NATIONAL FIRE INSURANCE CO. OF HARTFORD, et al.

No. 41206          October 26, 1959          115 So. 2d 54

*Bobby J. Garraway, Purvis, Blass & Parsons,* Wiggins, for appellant.

*Watkins & Eager,* Jackson, for appellees.

APPELLANT IN REPLY.

ROBERDS, P. J.

The main question to be determined on this appeal is the extent of the powers of appraisers under a windstorm insurance policy. Is that power limited to an ascertainment of the damage to the property or does it include the power on behalf of the appraisers to determine the cause of the damage to the property? We have concluded that the appraisers have no power to determine the cause of the damage. Their power is limited to the function of determining the money value of the property which may be damaged by the storm.

The question arises under the following circumstances: On April 4, 1957, the two appellee insurance companies had issued two fire and storm policies upon the residence of appellant Munn in the total sum of $4,000, and on his barn in the sum of $1,500 and on his chicken houses in the sum of $200. On the morning of said date of April

4, a violent storm occurred which did much damage to the property covered by the policies. Munn and the insurance companies could not agree upon the amount of the damage. Appraisers were duly appointed to estimate the damage under the standard provision contained in fire and storm policies. The appraisers made a report fixing the damage at $783.10 to the residence, $65 to the barn and $200 to the chicken houses. Munn called the attention of the appraisers to the fact that the walls of his residence were leaning and twisted and he requested that a money value be placed by the appraisers upon that loss. The appraisers refused to do that. The report they made did not include any damage to said walls. They refused to estimate that damage, not because the damage did not exist, but because in their opinion the damage to the walls was not caused by the windstorm.

Munn filed two bills in the chancery Court attacking the appraisal. He said the appraisers had no right to determine the cause of the damage; that the province of the appraisers was simply to ascertain and fix damages and not to determine what caused the damage. The two cases were combined and tried as one in the chancery court. On the trial testimony was introduced by both parties bearing upon whether or not the leaning and twisting of the walls of the dwelling resulted from the windstorm or from some other cause. The chancery court did not decide that question. He said he was bound by the report of the appraisers. His opinion contains this statement:

"The court also specifically finds that the report of the appraisers and umpire of an estimate to repair the premises, did not include an estimate to repair the leaning of the buildings.

"The court further specifically finds that the question of the building leaning was considered by the appraisers, but their conclusions, as a whole, was that the

leaning was not the result of windstorm damage on April 3d or 4th, 1957.''

He further found that the parties and the court were bound by the report of the appraisers and he did not determine or undertake to determine whether the damage to the walls of the dwelling was caused by the windstorm or some other force. This presents the main question involved on this appeal and that is whether or not it is the function of appraisers to determine what caused the damage.

■■ ■ The provision in the policy for the appointment of appraisers is as follows: ''Appraisers shall then appraise the loss, stating separately actual cash value and loss to each item.'' It further provides that the award of the appraisers ''shall determine the amount of actual cash value and loss.'' It is also provided that the appraisers shall take an oath that they will appraise the value of the damage to the property and in their report they shall state that they have done that. It is noted that nowhere in the standard form for submission to appraisal is any power vested in or conferred upon the appraisers to determine the cause of the loss, the value of which they shall appraise.

The appraisers are not arbiters. They have no power to arbitrate disputes between the property owner and the insurance company other than to value the property damage.

In Harrington v. Agricultural Ins. Co., 179 Minn. 510, 229 N. W. 792, the Court said: '' * * the right of the insurer to have a judicial determination of liability includes the right of a judicial determination of the coverage of the policy. Itasca Paper Co. v. Niagara Fire Ins. Co., 175 Minn. 73, 220 N. W. 425.''

In another Minnesota case, where the appraisers undertook to determine the cause of the loss, the Court said: ''They also found, apparently, that the loss was not covered by the policy. The latter finding was not

within their province and mere surplusage. The finding of appraisers on question of coverage, which would be a decision on a question of law, would not be final." The reporter deduced the following principle from the facts, issues and opinion in that case: "The coverage of an insurance policy against damage by fire or explosion is a question of law not within the province of a board of arbitrators, selected as provided by statute and the contract of insurance, and a finding by the board as to the amount of loss and its coverage by the policy will, as to the coverage, be regarded as surplusage." Mork v. Eureka-Security Fire & M. Ins. Co., 230 Minn. 382, 42 N. W. 2d 33, 28 A. L. R. 2d 987.

In 45 C. S. J., Insurance, Sec. 1110, this statement appears: " * * stipulations for submissions to ascertain the 'amount of loss or damage' are to be construed to signify a proceedings to appraise and estimate the damage to the property described, but not to embrace the question of ownership or any other matter which goes to the root of the cause of action."

In Hartford Fire Insurance Co. v. Jones, 235 Miss. 37, 108 So. 2d 571, appears a splendid discussion of the effect of an appraisal in Mississippi. We quote the following from that opinion:

"Both sides have briefed this case on the theory that the report of the appraisers constituted an award under an arbitration agreement. It seems that all of the lawyers and the court completely overlooked the fact that the report of the appraisers is not an arbitration award. In 3 Am. Jur., Arbitration and Award, Sec. 3, at pp. 830-831, the distinction between the two is made quite clear. The report of appraisers fixing the amount of a fire loss is not an arbitration and award. We quote from the text cited: 'Arbitration is sometimes confused with other forms of procedure which have some points of similarity. For example, agreements in, or separate from, contracts, leaving to the decision of third persons

questions of price, value, amounts, quantities, or quali-
ties, are not, strictly speaking, submissions to arbitra-
tion, nor are such third persons properly called arbi-
trators. Some of these so-called arbitrations are mere
appraisements; others have some, many, or nearly all
of the characteristics of arbitrations. All of them, in
one or more particulars, differ from arbitrations. Ap-
praisement, in particular, is perhaps most often confus-
ed with arbitration. While some of the rules of law
that apply to arbitration apply in the same manner to
appraisement, and the terms have at times been used
interchangeably, there is a plain distinction between
them. In the proper sense of the term, arbitration pre-
supposes the existence of a dispute or controversy to
be tried and determined in a quasi judicial manner,
whereas appraisement is an agreed method of ascer-
taining value or amount of damage, stipulated in ad-
vance, generally as a mere auxiliary or incident feature
of a contract, with the object of preventing further dis-
putes, rather than of settling present ones. Liability
is not fixed by means of an appraisal; there is only
a finding of value, price, or amount of loss or damage.
The investigation of arbitrators is in the nature of a
judicial inquiry and involves, ordinarily, a hearing and
all that is thereby implied. Appraisers, on the other
hand, where it is not otherwise provided by the agree-
ment, are generally expected to act upon their own know-
ledge and investigation, without notice of hearings, are
not required to hear evidence or to receive the state-
ments of the parties, and are allowed a wide discretion
as to the mode of procedure and sources of informa-
tion.' We covered this point in the case of Home In-
surance Company v. Watts, 91 So. 2d 722, 726, not yet
reported in the State Reports.

''The agreement which was signed for an appraisal
is called 'Memorandum of Appraisal' and a careful read-
ing of the entire agreement shows that in no place is

the agreement, or the action of the appraisers thereunder, referred to as an arbitration and award, and in fact it is not an arbitration and award agreement but is purely an agreement for determining the value of the property destroyed.''

The able chancellor did not find, or undertake to find what caused the walls of the dwelling to twist and lean, he said he was bound by the conclusion of the appraisers that the damage to the walls was not caused by the storm. That involved the fundamental question of liability of the insurance companies. If the storm caused the damage, the insurance companies are liable. If some force or agency other than those mentioned in the policy caused the damage then the insurance companies are not liable. If appraisers have the power to look at the property and determine the cause of the damage, in addition to the extent thereof, they possess a power to arbitrarily say whether the insurance company is liable. That is just what was done in the case at bar. The appraisers, upon a mere cursory inspection of the premises, allowed nothing for damage to the walls, not because they were not damaged but because they thought the storm did not cause the damage. This was done without any kind of hearing. There was no taking of testimony or adjudication by the appraisers in a legal manner of the question at issue. That would simply deprive an owner of the property of his constitutional rights to have determined in a court of justice the liability of an insurer.

Under Section 24 of the Constitution of Mississippi such a procedure would be unheard of here.

The undisputed proof in this record is that it would take at least $6,000 to repair the injury to the walls of this dwelling. The great weight of the testimony is that the damage to the walls was caused by the storm. Munn introduced six witnesses on that question. He himself testified that the storm did cause the walls to lean.

Whorley, an engineer for the Farmers Home Administration, examined the walls before and after the storm. They were not leaning before but were leaning after the storm occurred.

Sumrall, a neighbor, testified he was familiar with the house, that he visited it a few days prior to the windstorm and the walls were not then leaning. After the storm they were leaning.

Hatten, county tax assessor, testified he had been in the house many times, before the storm and after the storm, and that the walls were not leaning before but were leaning after the storm occurred.

Robbins, a carpenter and contractor, testified it would cost at least $6,000 to repair the walls. He was the only witness who undertook to fix a dollar and cent cost of repair.

Sullivan, a carpenter, noticed the leaning condition of the walls two or three days after the storm, but he did not undertake to fix a price.

The insurance companies introduced three witnesses. Nelson H. Webb was an insurance adjuster and Munn's claim was referred to him. He had never seen the house before the storm. He said he examined it the day after the storm. The walls were leaning but he did not think the storm caused them to lean. He said he observed the doors were scraping the floors and had indented the floors about one-eighth of an inch, from which he concluded the damage was not done by the storm. He said he was on the premises only a short time.

Reeves was the appraiser selected by the insurance company. He examined the dwelling after the storm. He said some of the doors were scraping the floors and that the paint in the cracks of the walls looked like old paint. From that he concluded the storm did not cause the damage.

White, the other witness for the insurance companies, was the umpire who had been selected by the appraisers.

He concluded the storm did not produce the damage to the walls because the walls appeared to be "pulled loose." He also said there was old paint in the cracks of the walls.

It is not our duty to pass upon the weight of the testimony under the proceeding herein, but we have briefly outlined the evidence as bearing upon the action of the chancellor in concluding he was bound by the appraisal.

██ █ Of course, it is elementary law that an appraisal is presumptively correct, but it is also the law that the court may set aside the appraisal where the award is so grossly inadequate or excessive as to amount to a fraud in effect, although fraud is not charged, or where the appraisers were without authority, or where there is a mistake of fact or to prevent injustice. 29 Am. Jur., Insurance, Sec. 1251, page 934; Harrington v. Agricultural Ins. Co., supra; Mork v. Eureka-Security Fire & M. Ins. Co., supra.

██ █ The chancellor should have judicially determined what force caused the walls to lean and twist. That was not a question for the appraisers to decide. If that damage was the result of the storm, then the appraisers should have been directed to estimate the value of the loss occasioned by the walls being damaged.

Reversed and remanded.

*McGehee, C. J.,* and *Hall, Lee, Kyle, Holmes* and *Arrington, JJ.,* concur.

ETHRIDGE, J., dissenting:

This case presents a problem the answer to which I conceive to be well-established in insurance law. The appraisers were to determine the "actual cash value and loss." The phrase "actual cash value" means the value of the property immediately before the windstorm. Yet the controlling decision holds, in effect, that the appraisers cannot determine the condition of the walls and foun-

dation of the building at that time, but that this is a question of "liability," which is for the court.

Manifestly, it would be impossible for appraisers to determine the actual cash value of property before the storm without considering and determining the age, condition and deterioration in the structure itself, including the walls. The end result of the majority opinion is to conclude that, in appraising the value of the property before the storm, the appraisers cannot consider the condition of the walls. Yet this function is necessary to determine the "before" value, and that is a condition precedent to ascertaining the loss. Moreover, the controlling opinion, in my view, does not cite, distinguish, or follow established precedents interpreting such an appraisal clause. If applied in the future it will substantially emasculate the standard appraisal clause in casualty insurance policies.

We are concerned here with the standard appraisal or arbitration clause of the 1943 New York Standard Fire Policy. It provides: "In case the insured and this Company shall fail to agree as to the actual cash value or the amount of loss, then, on the written demand of either, each shall select a competent and disinterested appraiser and notify the other of the appraiser selected within twenty days of such demand. The appraisers shall first select a competent and disinterested umpire; and failing for fifteen days to agree upon such umpire, then, on request of the insured or this Company, such umpire shall be selected by a judge of a court of record in the state in which the property covered is located. The appraisers shall then appraise the loss, stating separately actual cash value and loss to each item; and, failing to agree, shall submit their differences, only, to the umpire. An award in writing, so itemized, of any two when filed with this Company shall determine the amount of actual cash value and loss."

In brief, the award *"shall determine* the amount of actual cash value and loss." Provisions of this type are supported by the same consideration that support all other agreements in policies. Franklin Fire Insurance Co. v. Brewer, 173 Miss. 317, 329, 159 So. 545, 160 So. 387 (1935). Similar appraisal clauses are uniformly upheld as offering a prompt and inexpensive method of adjusting disputes regarding values and extent of damages. 3 Richards, Insurance, (5th Ed., 1952), Sec. 549. Appraisals are mere auxiliary arrangements in a limited contractual area, and have been upheld generally and in Mississippi on grounds of a sound public policy. 6 Appleman, Insurance Law and Practice (1942), Sec. 3921; Aetna Insurance Co. v. Cowan, 111 Miss. 453, 71 So. 746 (1916); Scottish Union & National Insurance Co. v. Skaggs, 114 Miss. 618, 75 So. 437 (1917); Hartford Fire Insurance Co. v. Conner, 223 Miss. 799, 79 So. 2d 236 (1955); Home Insurance Co. v. Watts, 229 Miss. 735, 91 So. 2d 722 (1957); Hartford Fire Insurance Co. v. Jones, 108 So. 2d 571 (Miss. 1959).

Appellant and appellee agreed that a proper appraisal should be final in determining the amount of actual cash value and loss.

Moreover the scope of judicial review of an award of appraisers is carefully limited. It is stated in 6 Appleman, Insurance Law, Sec. 3941, as follows: "An award of the arbitrators or appraisers is supported by every reasonable presumption and intendment, and it will be sustained even though it does not conform to what would have been the judgment of the court. Thus, where two methods might have been used in reaching the result, one of which was legal and the other not, the presumption is that the legal method was followed. And an appraiser will not be heard to impeach his own decision. So, an arbitrator's letter interpreting an award, written after he became functus officio, could not be considered in construing the award. Generally, an award will not be vacated unless it is clearly shown that it was

the result of fraud or mistake, or of the misfeasance or malfeasance of the appraisers or arbitrators. . . .''

In other words, an award of appraisers is conclusive as to the amount of loss, in the absence of fraud or mistake. 3 Richards, Insurance, Sec. 553.

Munn, the complainant, asked for an appraisal. He and the company appointed appraisers and they selected an umpire. Their original appraisal award is in the record. It reflects detailed figures as to the actual cash value of the property, before the windstorm, and their finding as to the amount of loss. One appraiser and the umpire testified. They said all three concluded that the leaning walls of the house were not caused by the windstorm. The building was from 30 to 50 years old, of wood construction, with two stories. All three agreed on the amount of the award. They agreed that the leaning walls existed before the windstorm and were the results, in effect, of the age or deterioration of the house, or depreciation in it over the many years of its life.

There is no evidence whatsoever to show that the arbitrators acted through fraud or bad faith or through any material mistake of judgment. There is no showing of misfeasance or malfeasance on their part. Under the policy, they had the duty to determine the actual cash value of the house before the windstorm, and the loss to it from the storm. Obviously, in order to determine the actual cash value or the true value of the house before the storm, it was necessary for them to consider the depreciation of this old two-story home.

As stated in 3 Richards, Insurance, pp. 1854-1855, ''. . . proper deduction must be made for depreciation in values caused by age and use.'' Michels v. Western Underwriters Association, 129 Mich. 417, 89 N. W. 56 (1902). All of the cases interpreting the phrase ''actual cash value'' support that conclusion, and so hold. Some of them state the matter alternatively, referring to the replacement value of the house in its condition at the

time. The condition of the property at the time must necessarily be considered by appraisers. 2 Words and Phrases (Perm. Ed. 1955), pp. 332-338, and 1959 Supp., p. 9, cites many cases defining "actual cash value" in casualty insurance policies. That figure depends on the nature of the property insured, the condition of such property and other circumstances existing at time of loss. Newark Fire Insurance Co. v. Martineau, 26 Tenn. App. 261, 170 S. W. 2d 927, 930 (1943).

In New York Central Mutual Fire Insurance Co. v. Diaks, 69 So. 2d 786, 788 (Fla. 1954), it was said the phrase must be considered in the light of replacement cost, less depreciation and other facts pertaining to value. In Lee v. Providence-Washington Insurance Co., 82 Mont. 264, 266 Pac. 640, 644 (1928), the measure of recovery should be based on the actual value of the property in the condition it was in at time of loss, taking into consideration its age and condition. An allowance must be made for depreciation. Patriotic Order Sons of America, Hall Association v. Hartford Fire Insurance Co., 305 Pa. 107, 157 A. 259, 260, 78 A. L. R. 899 (1931). To the same effect are Fire Association of Philadelphia v. Coomer, 158 S. W. 2d 355, 357 (Tex. Civ. App., 1942); Metz v. Travelers Fire Insurance Co., 355 Pa. 342, 49 A. 2d 711, 713 (1946); Butler v. Aetna Insurance Co., 64 N. D. 764, 256 N. W. 214, 218 (1934); Sun Insurance Office v. Rupp, 64 Fed. Supp. 533, 538, 539 (1946); Pinet v. New Hampshire Fire Insurance Co., 100 N. H. 346, 126 A. 2d 262, 264 (1956).

The preceding cases illustrate the established rule that, in determining the actual cash value of property at the time of the fire under a casualty insurance policy, the appraisers must take into consideration its age and condition, depreciation, deterioration and obsolescence. In the instant case the appraisers considered the deterioration, age, and condition of the house at the time of the fire, which was their duty. They decided that the lean-

ing walls existed before the windstorm. So naturally they did not award to the insured any loss for them.

See also Pacific National Fire Insurance Co. v. Beavers, 87 Ga. App. 294, 73 S. E. 2d 765, 770-771 (1952); Georgia Home Insurance Co. v. Kline, 114 Ala. 366, 21 So. 958 (1897); Schreiber v. Pacific Coast Fire Insurance Co., 195 Md. 639, 75 A. 2d 108, 20 A. L. R. 2d 951 (1950); see also 1 C. J. S., page 1434; 6 Appleman, Insurance Law, Sec. 3946; New York Central Mutual Fire Insurance Co. v. Diaks, 69 So. 2d 786 (Fla. 1954).

45 C. J. S., Insurance, Sec. 1126, pp. 1367, 1368, deals with this issue: ''Where the parties to a policy have submitted a difference as to the amount of the loss to arbitration or appraisal, they are mutually bound as to the amount of the loss by the award of the arbitrators or appraisers, if valid. So a finding that there was no loss is binding, since the right to determine the amount of loss carries with it by necessary implication the right to determine that none existed. An award does not fix the liability of insurer, however, where both by the terms of the policy and of the submission it is limited in its effect to the determination of the amount of the loss; it merely determines the amount of insurer's liability in the event that he should be found liable, and leaves the question of insurer's liability to litigation. For reasons not connected with the award insurer may not be liable at all, but, if liable, he must pay the amount named in the award.''

Two recent Massachusetts cases are particularly pertinent on this question. In F & M Skirt Co. v. Rhode Island Insurance Co., 316 Mass. 314, 55 N. E. 2d 461 (1944), the appraisers under a fire insurance policy were to determine ''the amount of loss or damage.'' After a hearing they found that there was no loss or damage sustained by the insured. The court held this finding was within the appraiser's duty. It said:

''The pertinent provisions of the governing statutes demonstrate that the contract of insurance provides not

for the arbitration of the question of liability, but only for the determination of the amount of the loss sustained by the insured in case the parties are unable to agree. . .

"The plaintiff's position is that by submitting the matter to arbitration the defendant is estopped to deny that a loss was sustained; that it may be heard only on the question of the amount of loss; and that an award that determined that no loss was sustained was not within the scope of the reference. We think that this construction of the policy is not sound. Obviously the referees would not have the right under such a reference to determine whether a loss, if sustained, was covered by the policy or whether the policy had ever taken effect; in other words, to decide questions pertaining to liability. But the right to determine 'the amount of loss' carries with it by necessary implication the right to determine that none existed."

In Fox v. Employers' Fire Insurance Co., 113 N. E. 2d 63 (Mass. 1953), the Massachusetts court again dealt with the duties of appraisers. The court held that they must determine the extent of loss and the source of the damage to the building. Fox's garage was covered by a clause protecting as to damage caused by lightning, but excluding loss by windstorm. The policy provided for the selection of three appraisers to determine the amount of loss or damage. Apparently lightning struck the roof of the garage, making a hole in it, and the accompanying wind entered through the hole and blew the roof off. The appraisers determined the loss from lightning was $317. Fox sued to recover on the policies, alleging that the award of appraisers was prejudiced and exceeded their jurisdiction. They had determined only the amount of loss from lightning, and did not consider any loss from windstorm, since admittedly that was not covered by the policy. Plaintiff contended that the appraisers' duty was to determine the loss from all causes,

including windstorm, as well as lightning. The trial court adopted that view, and instructed the jury to find the total loss ''caused by all causes,'' whether lightning or wind, stating the appraisers' duty was to report the total loss, leaving to the court the function of passing upon ''liability.'' The trial court, with a jury, set aside the appraisers' award and held that the amount of loss by lightning was $3,825.

On appeal the judgment was reversed. It was held that the appraisers acted properly in determining the amount of loss only by lightning, and not including any loss which was caused by windstorm. The court said: ''. . . it is the amount of the loss or damage under the policy which the referees must determine. It is not the amount of loss or damage whether covered by the policy or not. No practical good would be accomplished by the method for which the plaintiff contends and which was adopted in rulings at the trial. The parties would not be given what they bargained for in the contract of insurance. The summary determination of the amount of loss intended by the statute would be utterly defeated and confusion provided in its stead.

''In order intelligently to determine the amount of loss or damage under a given policy, as an incidental step in their deliberations, the referees must reach their own conclusions as to what they think that loss or damage is. Such conclusions must necessarily be affected by what they think the coverage is. Their views so far as ultimate liability goes are wholly tentative and in no sense a decision on that underlying question. . . . In the case at bar it would have been beyond the scope of the reference for the referees to include in their award the amount of loss or damage due to windstorm. A form of extended coverage would have been necessary to embrace that; yet the contention of the plaintiff would lead to the same award irrespective of the plaintiff's omission to carry extended coverage. . . .''

Plaintiff relied in part on *F & M Skirt Company*, with reference to the statement therein that appraisers could not determine "liability." The court replied: "It is obvious that in the quoted language this court was referring to ultimate liability and was not undertaking to speak with regard to the precise question now before us. It is one thing to impeach an award for error of law and quite another to assert that referees exceeded their authority in confining their award to the loss or damage covered by the policy. We do not understand that it is contended that the referees in the case at bar were in error in their construction of the policies." Hence the court reinstated the award. In brief, it held the appraisers had the duty to determine what part of the loss or damage to the building was caused by lightning, the sole coverage under the policy; and that, in doing so, they properly excluded any loss caused by wind. Appraisers could not determine "ultimate liability," for an error of law, but they should determine whether and to what extent the particular loss was caused by lightning as covered by the policy. In so acting, they had to determine what loss was caused by wind, and exclude that, since it was not covered by the policy.

In summary, I think the chancery court was correct in refusing to upset the unanimous award of the appraisers. Appraisals are upheld on grounds of sound public policy. The instant contract of insurance had a standard provision. The appraisers unanimously determined the actual cash value of the property before the loss. This was their duty under the contract, and of course, in order to do this, they had to determine the condition of this 30-50-year old house prior to the loss. They decided that the walls were leaning before the windstorm, and this decision was a necessary part of their fixing the actual cash value. They then determined the loss. They made no determination as to liability or coverage under the policy. They simply fixed the amount of the loss by first determining the value of the building

before the windstorm, and then the damage from the windstorm. All of the authorities appear to hold that appraisers, in fixing the actual cash value before loss, must consider the age and condition of the building. There is no evidence whatever of fraud or mistake. So I would affirm the decree of the chancery court.

*Gillespie, J.,* joins in this dissent.