Dr. Robert A. MITCHELL, Plaintiff-Appellant Cross-Appellee,

v.

AETNA CASUALTY AND SURETY COMPANY, a Foreign Corporation, Organized and Existing Under the Laws of the State of Connecticut, et al., Defendants-Appellees Cross-Appellants.

No. 76–2980.

United States Court of Appeals, Fifth Circuit.

Sept. 1, 1978.

---

Clyde O. Hurlbert, Biloxi, Miss., for plaintiff-appellant cross-appellee.

Rae Bryant, Gulfport, Miss., for Aetna Casualty & Surety Co.

W. F. Goodman, Jr., Velia Ann Mayer, Jackson, Miss., for Fireman's Fund Ins. Co., et al.

Before WISDOM, THORNBERRY, and RUBIN, Circuit Judges.

WISDOM, Circuit Judge:

In the wake of Hurricane Camille came adjustors, lawyers, and many disappointed insured property owners. In this insurance litigation arising out of Camille all the parties are dissatisfied with the jury's award. The jury awarded the claimant, Dr. Robert A. Mitchell, the amount he sued for, but he contends that the trial judge erred in allowing interest only from the date of the judgment. The defendant insurance companies argue that the trial court should have directed a jury verdict in their favor, or, at the least, that the court should have given different instructions to the jury. We agree that the instructions did not properly present the case to the jury and that the court should have directed a verdict for the defendants on the issue whether Dr. Mitch-

ell could rely upon an agreement allegedly reached with an insurance appraiser. We therefore reverse and remand for a new trial on the other issues.

On August 17, 1969, Hurricane Camille struck the Mississippi Gulf Coast. Dr. Mitchell owned a complex of two buildings in Gulfport. One was two-storied with apartments upstairs and offices downstairs; the other was a drugstore. Dr. Mitchell alleged that Camille tore the roof from these buildings and that wind and wind-driven rain totally destroyed the property. One could see the sky through two-thirds of the building; plaster dropped in chunks; furniture was soaked.

Dr. Mitchell carried insurance totalling $55,000 on these properties with Aetna Casualty and Surety Company, Fireman's Fund Insurance Company, Granite State Insurance Company, Maryland Casualty Company, and New Hampshire Insurance Company (the Insurance Companies). Dr. Mitchell notified agents for the five companies of his loss. They authorized him to make temporary repairs to minimize losses before the adjustment of his claims.

A Mr. Pray of the General Adjustment Bureau communicated with Dr. Mitchell on behalf of the Insurance Companies. Pray and Dr. Mitchell agreed that the loss totalled $42,312.18. Pray apportioned this amount among the Insurance Companies, according to the amount of coverage they had underwritten. He also prepared proof of loss forms which Dr. Mitchell signed on September 25, 1969.

Dr. Mitchell understood his agreement with Pray to be a final agreement with the Insurance Companies of the amount he would receive. Some of the Insurance Companies issued checks based on the forms prepared by Pray. Before Dr. Mitchell received the checks, however, Mr. J. S. McClure, another adjustor from the General Adjustment Bureau, reviewed Dr. Mitchell's loss. McClure concluded that the $42,312.18 figure was too high. As a result, the Insurance Companies reduced the amount they were willing to pay to $20,900 and recalled the checks previously issued. Before November 12, 1969, they informed Dr. Mitchell that they would not approve the amount Pray had recommended.

On November 12, 1969, Dr. Mitchell wrote each Insurance Company. He complained about the second adjustor having been sent, and asserted that "Mr. McClure's only function is to whittle my loss and to chisel". Dr. Mitchell demanded "arbitration".

The Insurance Companies interpreted Dr. Mitchell's demand for "arbitration" as a request that his loss be appraised under the standard appraisal clause contained in all five policies.[1] This clause provides that upon written demand by either the insured or the company, each party will appoint a disinterested appraiser. The two appointed appraisers select an umpire to resolve disagreements among them. Each party pays its own appraiser and one half the cost of the umpire. Dr. Mitchell testified that his demand for arbitration was not a request for an appraisal, but an attempt to enforce the Pray agreement. Nevertheless, Dr. Mitchell appointed an appraiser and incurred his share of the appraisal expenses. He never objected to the Insurance Companies' interpretation of his demand for "arbi-

---

1. The appraisal clause in each policy provided as follows:

In case the insured and this Company shall fail to agree as to the actual cash value or the amount of loss, then, on the written demand of either, each shall select a competent and disinterested appraiser and notify the other of the appraiser selected within twenty days of such demand. The appraisers shall first select a competent and disinterested umpire; and failing for fifteen days to agree upon such umpire, then, on request of the insured or this Company, such umpire shall be selected by a judge of a court of record in the state in which the property covered is located. The appraisers shall then appraise the loss, stating separately actual cash value and loss to each item; and, failing to agree, shall submit their differences, only, to the umpire. An award in writing, so itemized, of any two when filed with this Company shall determine the amount of actual cash value and loss. Each appraiser shall be paid by the party selecting him and the expenses of appraisal and umpire shall be paid by the parties equally.

tration" as an initiation of appraisal proceedings under the policy. Although Dr. Mitchell did not have a lawyer when he originally wrote the Insurance Companies, he retained counsel shortly thereafter. Dr. Mitchell's lawyer helped locate an acceptable appraiser for Dr. Mitchell. The lawyer communicated with the Insurance Companies and never stated that Dr. Mitchell objected to the appraisal. Dr. Mitchell never renewed his request for "arbitration". He never asked to stop the appraisal proceeding as a mistake.

On October 20, 1971, the appraisers set Dr. Mitchell's loss at $20,957.41. At various times before the appraisal, Dr. Mitchell had repaired hurricane damage at his own expense. He had also added improvements to the buildings that did not exist before Camille. The appraisers did not determine the loss to each building or to the component parts of the buildings, although the appraisal provision in the policies called for the loss to be itemized.

The Insurance Companies tendered $20,957.41 to Dr. Mitchell. Dr. Mitchell's attorney returned the checks to the Insurance Companies on November 30, 1971. The accompanying letter explained:

> . . . Dr. Mitchell hereby rejects such appraisal as being so inadequate as to be in effect a fraud and on the ground that the appraiser certainly made a mistake in arriving at the actual cash value before the loss and the loss. It is further rejected on the ground that said appraiser [sic] does not comply with the terms of the policies in force at the time of the loss.

Dr. Mitchell did not object on the ground that that appraisal committee was wrongfully empaneled.

Dr. Mitchell finally brought suit against the Insurance Companies in August 1975 shortly before the statute of limitations expired. In the first count of his complaint he asserted that his property had been a total loss, and he asked for the full $55,000

value of the policies, with costs and interest from the date of the loss. In the second count he alleged that he had entered into an agreement with Pray, representative of the Insurance Companies. He asked that this agreement be enforced and that he receive a judgment of $42,312.18. The Insurance Companies conceded liability of $20,957.41 and deposited that amount in the registry of the court. They denied that the agreement with Pray had any validity and relied upon the appraisal.

The case was tried before a jury. Only Dr. Mitchell testified. In the course of his testimony he said that he had rejected the appraisal because it was too low. After the plaintiff rested, and again at the end of the entire case, the Insurance Companies unsuccessfully moved for a directed verdict in their favor.[2] After being instructed, the jury returned a verdict of $42,312.18 with interest from September 25, 1969. The district judge denied the defendants' motion for a judgment notwithstanding the verdict or for a new trial. The district judge, however, granted the Companies' motion for an amended judgment. He vacated the jury's interest award and allowed interest only from May 6, 1976, the date of the jury verdict and entry of judgment.

For the jury to have reached a verdict in the amount of $42,312.18, it was necessary for the jury to accept Dr. Mitchell's argument that he had a binding contract with the Insurance Companies, entered into with their agent Pray, to pay $42,312.18 for his hurricane losses. The Insurance Companies have two major arguments against this theory. First, they contend that there never was an agreement because Pray had no authority, real or apparent, to settle Dr. Mitchell's claim. According to the Insurance Companies, there is no proof in the record that Pray had actual authority to make a final settlement of a claim. They concede that Dr. Mitchell could also prevail by showing Pray had apparent authority.

---

**2.** In the alternative, the Insurance Companies moved the court to submit to the jury only the question whether there was wind damage to portions of the building not considered by the

appraisers, in which case the appraisers should be directed to estimate the value of the additional loss. This motion was also denied by the district court.

They point out, however, that under Mississippi law there are three essential elements to claims based on apparent authority: (1) acts of the principal; (2) reliance on these acts by a third person; and (3) a change of position by the third person to his detriment. *Steen v. Andrews*, 1955, 223 Miss. 694, 78 So.2d 881, 883. The Insurance Companies do not dispute the first two elements, but contend that Dr. Mitchell did not change his position to his detriment before the Insurance Companies repudiated any apparent authority that Pray might have had.

Second, the Insurance Companies argue that even if the Pray agreement was valid at one time, when Dr. Mitchell requested "arbitration" and participated in the appraisal proceedings he "waived and abandoned" any agreement with Pray.

■ The district court did not instruct the jury on the Insurance Companies' answers to Dr. Mitchell's attempt to enforce the supposed agreement with Pray. Dr. Mitchell defends this shortcoming on the ground that the Insurance Companies never raised their contentions before the trial judge. The record shows that the issues were adequately raised below. It is true that the Companies did not propose any instructions specifically outlining the elements of apparent authority or of waiver and abandonment. The Companies did object, however, to several instructions proposed by the plaintiff and given by the district court. Among other things, the Insurance Companies contended that the instructions given foreclosed jury considera-tion of the questions of authority and of waiver and abandonment. The issues whether Pray had any actual or apparent authority and whether Mitchell waived and abandoned any agreement with Pray were also discussed by both sides during argument on the Insurance Companies' motion for a directed verdict. Because the authority and waiver and abandonment questions were raised below, and because they are supported by the evidence, the Insurance Companies were entitled to have them presented to the jury through proper instructions.[3]

■ In fact, our review of the record shows that there is so much support in the evidence for the Insurance Companies' theory that Dr. Mitchell may not rely upon an agreement with Pray that the district judge should have directed a verdict in the Companies' favor on that issue. Either of two legal doctrines could deprive Dr. Mitchell of the benefit of any agreement with Pray. First, the facts might show that he and the Insurance Companies agreed to abandon or waive any settlement agreement. Second, the facts might show that Dr. Mitchell should be estopped from enforcing any agreement with Pray. The concepts of waiver and estoppel are related, but distinct. In waiver, the question is whether the waiving party knowingly and intentionally relinquished a right. The actions of the party asserting waiver are irrelevant. In the question of estoppel, while the intention of the parties sought to be estopped may be significant, the emphasis is on the actions of the party arguing estoppel. A

3. If nothing else, the district court's instructions are insufficient because they did not give the jury a complete legal structure within which it could decide the case. One instruction told the jurors "if you believe from a preponderance of the evidence that Dr. Mitchell did have that agreement with the adjustor, then your verdict would be, 'We the jury find for the plaintiff in the amount of [$42,312.18] plus six percent interest . . . from and after September 25, 1969' ". The next instruction told the jurors "[o]n the other hand, if it is your conviction that there was a perfectly valid appraisal of this property strictly in accordance with the terms and provisions of the policy, the appraisement was for $20,957.41. If it is your verdict that the appraisal is perfectly valid and in accordance with the terms and provisions and requirements of each one of these five policies . . . then your verdict would be, 'We the jury find for the plaintiff against said five insurance companies in the ratio of their insurance policy in suit in their aggregate amount of $20,957.41 . . .' ". By following these instructions, the jury could have found both that Dr. Mitchell and Pray had an agreement, *and* that the appraisal was valid. In that event, the district court's instructions told the jury to award both $42,312.18 *and* $20,957.41. Without an instruction on waiver, the jurors would have had no idea what to do.

Court will estop—in other words, prevent—a party from raising a valid legal argument if (1) his actions or words are inconsistent with the legal right he later asserts; (2) he intends or could expect that the party asserting estoppel would act upon his words or conduct; (3) he knows the real facts; (4) the party asserting estoppel does not know the true facts; (5) the party asserting estoppel relies upon the conduct or statements of the party to be estopped; and (6) the party asserting estoppel is harmed or prejudiced by his reliance. *See, e. g.,* 3A A. Corbin, *Corbin on Contracts* § 752 (1960); D. Dobbs, *Handbook on the Law of Remedies* § 2.3 (1973); 1 S. Williston, *A Treatise on the Law of Contracts* § 139 (3d ed. W.H.E. Jaeger, 1957). The same facts may, but need not, establish both a waiver and an estoppel.

■ The situation is further complicated because, strictly speaking, the doctrine applicable to the Insurance Companies' argument that Dr. Mitchell intentionally abandoned the entire Pray contract (if one ever existed) is that of discharge by recission, rather than that of waiver. *See* 3A A. Corbin, *Corbin on Contracts* § 752 at 479; *compare Restatement of the Law of Contracts* § 308 (1932) (waiver) *with id.* § 406–409 (recission). Recission means a mutual agreement by the parties to an existing contract to discharge and terminate their duties under it. The facts must show intent on both sides to abandon the benefit of the contract as well as mutual consideration. 5A A. Corbin, *Corbin on Contracts* § 1236 (1964). Fortunately, the only question open to dispute in this case is whether Dr. Mitchell intended to abandon the benefit of any Pray agreement. The Insurance Companies certainly intended to abandon any Pray agreement. Mutual abandonment of the Companies' promise to pay $42,312.18 and Dr. Mitchell's promise to accept that amount as a final settlement would supply consideration from both sides. Therefore, in this case there is no practical difference between waiver by Dr. Mitchell and recission.

■ The Insurance Companies rely upon waiver and recission rather than estoppel. We agree that the record establishes a recission of any agreement between Mitchell and Pray. A recission or waiver can be found in the conduct as well as the words of the parties. *See, e. g., Restatement of the Law of Contracts* § 408 (recission found if parties enter into an inconsistent contract). Dr. Mitchell now explains that when he asked for "arbitration" he did not mean to ask for an appraisal in place of the disputed Pray agreement. He further explains that he cooperated in the appraisal only because he feared that if he refused to cooperate he would forfeit all rights to recover from the Insurance Companies. If Dr. Mitchell had sent only the original letter, we agree a jury issue would exist whether he intended to abandon his insistence on the Pray agreement. But Dr. Mitchell's subsequent conduct removes any ambiguity. A reasonable jury could not believe that Dr. Mitchell, who was assisted by a competent attorney, did not understand the consequences of participating in the appraisal without protest. Similarly, if Dr. Mitchell had truly feared that a protest or failure to cooperate would cause him to forfeit all policy rights, his lawyer could have reassured him. With legal advice, Dr. Mitchell should have known what steps were necessary to enforce the Pray agreement if he wished to do so, or to pursue a demand for arbitration if that were different from appraisal. Under such circumstances, Dr. Mitchell's failure to act reveals his intent not to enforce the Pray agreement or to pursue a demand for "arbitration." The only reasonable interpretation of all the facts presented at trial is that Dr. Mitchell abandoned his attempt to enforce the disputed Pray agreement and instead agreed to resolve his dispute with the Insurance Companies through appraisal.[4]

■ Because Dr. Mitchell may not rely upon any agreement with Pray, there is no

---

**4.** Although we rely primarily upon our determination that the record unquestionably shows a waiver or offer of recission through conduct, our conclusion is bolstered because the facts also show elements of estoppel. *See generally Northern Assurance Co. v. Grand View Building Ass'n.,* 1902, 183 U.S. 308, 22 S.Ct. 133, 46 L.Ed. 213. Dr. Mitchell's letter, his subsequent

need for a jury to decide whether Pray had authority to settle the loss.[5] Dr. Mitchell may still attempt to impeach the appraisers' award. A retrial of that aspect of the case is necessary because the erroneous submission of the Pray agreement to the jury improperly confused the impeachment issue. Furthermore, the Insurance Companies raise meritorious objections to some of the district court's instructions concerning the circumstances when a jury can set aside an appraisal award.

The district judge instructed the jury that if it found the technical requirements for the appraisal set forth in the policies had not been followed, the appraisal was a nullity. The district judge also instructed the jury that if it found that Dr. Mitchell had made repairs in his buildings after Camille and that the appraisers had not considered the effect of those repairs when they determined the loss, the appraisal should be ignored.[6] The Insurance Companies argue that these instructions do not

failure to object to the Insurance Companies' interpretation of his letter as a request for appraisal, and his full participation in the appraisal proceedings predictably led the Insurance Companies to participate in the appraisal. If Dr. Mitchell were now allowed to repudiate the appraisal and to insist on the Pray agreement the Insurance Companies would lose their part of the costs of the appraisal in which Dr. Mitchell's conduct induced them to participate.

**5.** If the jury were to consider Pray's authority, we would agree with the Insurance Companies that the plaintiff did not meet his burden of showing actual authority. Dr. Mitchell argues that there was evidence the Insurance Companies issued checks after Pray adjusted the loss, and contends there is "no stronger proof of the actual authority of Pray to act for and bind these companies than the issuance of checks by the companies". Dr. Mitchell also argues that Pray's actual authority is established by § 83–17–1 of the Mississippi Code. We do not find the Insurance Companies' issuance of checks to be as conclusive as Dr. Mitchell argues. Pray did not write the checks himself, nor is there any evidence in the record that he had the authority to do so. Furthermore, the record shows that the checks were recalled before Dr. Mitchell received them. Dr. Mitchell learned by accident that the checks, existed. The recall of the checks negates any implication that Pray had actual authority to settle claims that the issuance of the checks might have created.

Section 83–17–1 of the Mississippi Code provides in relevant part:

Every person . . . who shall examine into or adjust or aid in adjusting any loss for or on behalf of any . . . insurance company, whether any of such acts shall be done at the instance or request or by the employment of the insurance company or of or by any broker or any person, shall be held to be the agent of the company for which the act is done or the risk is taken as to all the duties and liabilities imposed by law, whatever conditions or stipulations may be contained in the policy or contract.

Unquestionably, this statute makes Pray an agent of the Insurance Companies. Nowhere, however, does § 83–17–1 delineate the scope of Pray's agency. *See Saucier v. Life and Casualty Insurance Co.,* S.Ct. Miss. 1940, 189 Miss. 693, 198 So. 625, 628 (construing predecessor statute to § 83–17–1). The purpose of § 83–17–1 is to prevent insurance companies from avoiding legal liability by operating through third persons for whom they later deny all responsibility. *See* 198 So. at 627–28. The purpose is not to fix the scope of the authority of insurance agents.

A jury issue would have existed whether Dr. Mitchell relied to his detriment on Pray's appearance of authority. There is little evidence that Dr. Mitchell changed his position detrimentally in reliance on Pray's apparent authority. There is, however, some evidence that Dr. Mitchell arranged for expensive repairs in anticipation of an insurance settlement exceeding $42,000. We recognize that there is also evidence that Dr. Mitchell may have made repairs in reliance on instructions given by an insurance agent before Dr. Mitchell even met Pray. We also recognize that Dr. Mitchell gave little concrete evidence about the actual nature, amount, and time of the repairs, but instead relied largely upon his own estimates of the cost of repairs and the proportion of that cost incurred in the time between the Pray agreement and the Insurance Companies' repudiation of it. Nevertheless, we conclude that Dr. Mitchell's testimony concerning repairs in anticipation of the settlement approved by Pray created a question for the jury on the detrimental reliance issue.

**6.** Actually, the district court gave two instructions on this matter. In one, he told the jurors that if they found Dr. Mitchell's property had been substantially altered from its condition immediately after Hurricane Camille, and if they found that the appraisers had no information available about the changes in the condition of the property, and if they further found that this information would have substantially altered the amount of the appraisal, they should ignore the appraisal. In the other in-

state the law accurately. They also argue that the jury should have been instructed that appraisals are presumptively valid, few reasons justify overturning an appraisal, and Mississippi law favors out-of-court settlements.

■ In Mississippi, as in other states, it is difficult for a plaintiff to succeed in impeaching an award made by disinterested appraisers. *See* Watkins, *Appraisal Provisions of the Standard Fire Policy,* 34 Miss. L.J. 147, 157 (1963). Mississippi law favors amicable settlements of controversies without court involvement. *See, e. g., Scottish Union & National Insurance Co. v. Scaggs,* 1917, 114 Miss. 618, 75 So. 437; *Stout v. W.M. Garrard & Co.,* 1922, 128 Miss. 418, 91 So. 33. Only a limited number of reasons justify judicial interference with the results of an appraisal. The Mississippi Supreme Court has written:

> Of course, it is elementary law that an appraisal is presumptively correct, but it is also the law that the court may set aside the appraisal where the award is so grossly inadequate or excessive as to amount to a fraud in effect, although fraud is not charged, or where the appraisers were without authority, or where there is a mistake of fact or to prevent injustice.

*Munn v. National Fire Insurance Co.,* 1959, 237 Miss. 641, 115 So.2d 54, 58.

■ The Insurance Companies, therefore, are entitled to an instruction explaining the presumption in favor of appraisals and the preference for out-of-court resolutions of controversies. The Companies are also entitled to an instruction telling the jury that an appraisal award may be impeached for a limited number of reasons only.

■ Dr. Mitchell believes that the appraisers mistakenly failed to allow for the repairs made after Camille. This is a mistake of fact he is entitled to prove.[7] The Insurance Companies, however, are entitled to an instruction making clear that the burden of proof on such a contention is on the plaintiff, and that the Companies may rely upon the presumption that the appraisers did their job properly, in the absence of affirmative proof that the appraisers made a mistake. *See, e. g.,* 6 J. Appleman & J. Appleman, *Insurance Law and Practice* § 3941 (1972).

■ Dr. Mitchell also complains that he did not get the appraisal promised in his policies because the appraisers did not itemize his loss. The trial judge instructed the jury that unless the appraisers separately stated the actual cash value and loss for each item, the appraisal was to be ignored. The term "item" was not defined. Since there was no question that the appraisers did not itemize, this instruction was tantamount to an instruction that the appraisal should be disregarded. Indeed, the district judge informed counsel that he would rule as a matter of law that the appraisal was invalid if requested to do so.

On appeal, all parties agree there was no itemization. The Companies and Dr. Mitchell do not agree, however, what should have been itemized and what legal consequences flow from the failure to do so. On the first point, the Insurance Companies argue that the itemization clause in the policies requires only that the appraisers state the

---

struction the judge told the jurors that if they found that Dr. Mitchell made repairs to his property after Hurricane Camille that were necessitated by the hurricane, and if they found those repairs were made before the appraisal, and if they further found that those repairs would substantially affect the amount of loss found by the appraisers, then the appraisal of October 20, 1971 was invalid. Unlike the first instruction, this instruction did not explicitly require the jury to find that the appraisers did not know about the repairs. Such a requirement might be read into the need to find that

the repairs would substantially affect the amount of loss set by the appraisers, however.

7. Dr. Mitchell complains that none of the appraisers spoke to him about the repairs he had made. This is not a basis to invalidate the appraiser's award. Appraisers may rely upon their own inspection of the building. They are not required to hear evidence from the claimant or anyone else. *See, e. g., Franklin Fire Insurance Co. v. Brewer,* 1935, 173 Miss. 317, 159 So. 545; *Phoenix Insurance Co. v. Everfresh Food Co.,* 8 Cir. 1923, 294 F. 51, 55.

actual cash value and loss for each building. Dr. Mitchell, on the other hand, contends that the itemization clause requires the appraisers to specify the actual cash value and loss to each constituent part of the buildings. The district judge's comments during the trial show that he shared Dr. Mitchell's view.

Each insurance policy states, in relevant part:

> The appraisers shall then appraise the loss, stating separately actual cash value and loss to each item; and, failing to agree, shall submit their differences, only, to the umpire. An award in writing, so itemized, of any two when filed with this Company shall determine the amount of actual cash value and loss.

The face of each insurance policy listed each building as a whole as an "item".

The parties have not cited, nor have we discovered, any Mississippi authority interpreting the requirement to itemize. In *Campbell v. Union Mutual Fire Insurance Co.,* S.Ct. R.I. 1924, 124 A. 469, *rehearing denied,* 125 A. 273 the court held that when a policy covers real estate, there is only one item to appraise, and that the award may be for a gross sum without itemizing sound value and loss upon each constituent element of a building even when the policy requires an itemized appraisal award. Two leading treatises on insurance law state this position as a rule. *See* 6 J. Appleman & J. Appleman, *Insurance Law and Practice* § 3945 at 611 (1972); 14 G. Couch, *Couch on Insurance 2d* § 50:217 (1965). Making an educated guess under *Erie,* we conclude that the Mississippi Supreme Court would recognize the weight of these authorities and adopt their rule. We conclude too that it would follow the Sixth Circuit and hold that the term "item" in the appraisal provision refers to the "items" listed on the face of the policy, rather than to all the constituent elements of damage giving rise to the total loss. *Phoenix Assurance Co. v. Singer,* 6 Cir. 1964, 331 F.2d 10.

More important for the Insurance Companies, since they did not itemize at all, is their argument that an appraisal should not be invalidated for noncompliance with an itemizing requirement unless the plaintiff shows prejudice or injustice. Again, we have no Mississippi authority to guide us. The leading case in support of the Insurance Companies' view is *Melton Brothers v. Philadelphia Fire and Marine Insurance Co.,* N.J.Eq.1929, 104 N.J.Eq. 153, 144 A. 726, 729, citing *Caledonian Insurance Co. v. North Dutch Reform Church,* 96 N.J.Eq. 342, 124 A. 703; *McQuaid Market House Co. v. Home Insurance Co.,* 147 Minn. 254, 180 N.W. 97; *Innis v. Firemen's Fund Insurance Co.,* 218 Mich. 253, 187 N.W. 268; *Boutross v. Palatine Insurance Co.,* 100 Kan. 574, 164 P. 1069. This rule, however, is not universally followed. *See, e. g., Security Printing Co. v. Westchester Fire Insurance Co.,* Mo.App.1920, 204 Mo.App. 390, 221 S.W. 430; *Palma v. Watson Surplus Lines Agency,* Cal.App.1957, 148 Cal.App.2d 879, 307 P.2d 689.

■ In light of the preference of Mississippi courts for the resolution of controversies without court interference and Mississippi's policy of honoring an appraisal in most instances, we conclude that Mississippi courts would not invalidate an award for lack of itemizing without some showing of prejudice or injustice to the plaintiff. It seems particularly likely that Mississippi would take this view in a case such as this where the itemizing required by the policy would not be elaborately detailed or informative to the policyholder. Indeed, the district judge's ruling may have been influenced by his conclusion that the clause required the Insurance Companies to specify the loss from each component part of the buildings. If that were the requirement, it would be easier to assume that Dr. Mitchell was prejudiced by the lack of itemization. Dr. Mitchell believes that the appraisers did not take account of post-Camille repairs. This assertion would be easier to establish if the appraisers had itemized each element of loss. For instance, if the itemization had shown little or no loss to the roof, it would have been clear that the post-Camille reroofing had been ignored.

■ Finally, the Insurance Companies contend that under Mississippi law a technically insufficient appraisal should be remanded to the original appraisers for correction. This assertion could be important on remand if Dr. Mitchell proves that the appraisers failed to allow for post-hurricane repairs or that the failure to allocate the loss to each building caused prejudice or injustice. If the Companies are correct, in that event the appraisal would be invalid but the appraisers, rather than the jury, would make the necessary corrections.

The Insurance Companies find the rule that a defective appraisal should be remanded to the appraisers in *Munn v. National Fire Insurance Co.* In *Munn*, the appraisers were appointed to determine storm damage. They concluded that certain damage to the walls of one building had not been caused by the storm. They refused to include that damage in their award. *Munn* attacked the appraisers' award in court. The chancery judge refused to decide whether the storm had caused the damage because he believed that he was bound by the report of the appraisers. The Mississippi Supreme Court reversed. It held that the question whether the damage was caused by the storm, and thus covered by the policy, was one for the court, not the appraisers. The Mississippi Supreme Court accordingly remanded the case to the chancery judge for him to determine what caused the disputed damage. The Supreme Court concluded, in a sentence emphasized by the Insurance Companies, that "if that damage was the result of the storm, *then the appraisers should have been directed to estimate the value of the loss occasioned by the walls being damaged* ". 115 So.2d at 58 (emphasis added).

The Mississippi Supreme Court could have directed the chancery judge to determine the amount of damages to the walls himself if that determination became necessary. The trial record in *Munn* included some evidence about the amount of damage to the walls. 115 So.2d at 57. We agree with the Insurance Companies that the court's choice in these circumstances to remand the award to the appraisers reveals a general rule that the appraisers, rather than the trial judge or jury, should correct errors that the judge or jury may find to exist. This approach would be inappropriate only when an appraisal is vacated for fraud or another reason casting doubt on the basic competency of the appraisers.

As a practical matter, a remand to the appraisers is the most reasonable approach after the trial in this case. If the jurors had found that there was no valid agreement with Pray and that the appraisal was deficient, a redetermination of the loss would have been necessary. Dr. Mitchell could not have anticipated that the jury would fix the amount of loss, for he failed to introduce the evidence necessary to give them a basis for that determination.

■ Our conclusion that the Insurance Companies correctly argued that Dr. Mitchell could not endorse any settlement agreement reached with Pray controls the question whether Dr. Mitchell deserves prejudgment interest on any award. Dr. Mitchell's claim was not liquidated at the time of the suit. The Insurance Companies have always been ready to tender the award set by the appraisers. Their refusal to pay more was not frivolous, or in bad faith. The Mississippi cases do not allow a trial court to award pre-judgment interest in such circumstances. See, e. g., *Home Insurance Co. v. Olmstead,* Miss. 1978, 355 So.2d 310; *Commercial Union Insurance Co. v. Byrne,* Miss. 1971, 248 So.2d 777.

The judgment is REVERSED and REMANDED for a new trial.