**Michael ZERNICEK**

**v.**

**PETROLEOS MEXICANOS (PEMEX), Rayos X Industrial De Mexico S.A.**

**C.A. No. H–84–8.**

United States District Court,
S.D. Texas,
Houston Division.

July 26, 1985.

Charles M. Haden, Houston, Tex., for plaintiff.

Douglas S. Johnston, Crady & Peden, Houston, Tex., for defendant Petroleos Mexicanos (Pemex).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CARL O. BUE, Jr., District Judge.

Plaintiff brought this personal injury action in state court pursuant to the Jones Act, the general maritime law and the common law of negligence, alleging that the accident made the basis of this suit (i.e., the overexposure of radiation) was caused by the unseaworthiness of the vessels on which plaintiff was working and/or by the negligence of the defendant, Petroleos Mexicanos (hereinafter "Pemex") and Rayos X Industrial de Mexico S.A. (hereinafter "Rayos X").[1]

This Court acquired jurisdiction of the action pursuant to 28 U.S.C. § 1441(d), whereby the defendant Pemex petitioned for removal on the basis of its being a "foreign state" as such term is defined in section 1603(a) of Title 28, United States Code. The Court is, therefore, exercising its original jurisdiction over an action against a foreign state. 28 U.S.C. § 1330. Shortly after removal from state court, defendant Pemex sought an order of dismissal for want of jurisdiction under the Foreign Sovereign Immunities Act of 1976 (hereinafter "FSIA" or "the Act"). Although such challenge to the jurisdiction has heretofore been denied by the Court, leave was granted to defendant Pemex to re-urge the same at a later date.

On May 31, 1985, the case was tried to the Court without a jury, defendant Rayos X making no appearance. At the commencement of plaintiff's case, defendant Pemex moved again to dismiss on jurisdictional grounds. At the time defendant so moved, the Court had serious doubts that jurisdiction over defendant Pemex could be established; nonetheless, out of an abundance of caution, the Court deferred a ruling on defendant's motion so that all evidence relative to the jurisdictional question could be developed fully.

1. Original defendants Brown & Root, Inc. (hereinafter "Brown & Root") and Corporacion de Construcciones de Campeche, S.A. de C.V. (hereinafter "CCC") have been effectively dismissed from this suit pursuant to the Court's Final Judgment which was entered on April 22, 1985 following the compromise and settlement of plaintiff's claims against them.

Accordingly, having heard the testimony and having reviewed all of the documentary evidence, the Court hereby enters these Findings of Fact and Conclusions of Law, concluding that the Court does not have subject matter jurisdiction of plaintiff's claim against Pemex or *in personam* jurisdiction of Pemex under the Foreign Sovereign Immunities Act. Therefore, plaintiff's cause of action as to defendant Pemex should be dismissed.

## FINDINGS OF FACT

In 1980, Pemex and CCC, executed a general contract whereby CCC would provide or subcontract certain services with regard to the oil and gas exploration production operations being conducted by Pemex in the Bay of Campeche off of the Yucatan Peninsula in the Republic of Mexico.[2] (Plaintiff's Exhibit No. 13). In addition, Pemex contracted with Rayos X, another business entity organized under the laws of Mexico, to photograph and inspect pipe welds at the production site by the use of radiological isotopes held in metal containers. Thereafter, in 1981 and 1982, CCC entered into subcontracts with Brown & Root whereby Brown & Root would provide all or part of the services required by the General Contract. (Plaintiff's Exhibits Nos. 14 and 15).

In April of 1981, several years under the employ of Brown & Root, Michael Zernicek commenced his tour of duty in the Bay of Campeche where he served as a pipefitter foreman and later as a general foreman for the Pemex exploration production project. He was assigned to a fleet of vessels, owned or otherwise provided by CCC, which were in proximity to the fixed platform then under construction. His primary role was to carry out or supervise any necessary piping or other structural work for the platform.

This personal injury cause of action arose out of events occurring during the period of October, 1981 through April, 1982 while plaintiff was serving his tour in the Bay of Campeche. (Pretrial Order at 2). Although the exact date, time, and place of exposure is unclear from the record, it is clear that while under the employ of Brown & Root at the Bay of Campeche job site, plaintiff suffered an overexposure of radiation. Such radiation emanated from materials owned, used and controlled by Rayos X. Plaintiff became ill during the fall and winter months of 1981 and after initial treatment in Mexico, returned to the United States for medical evaluation and care where in January of 1982, he was diagnosed as having acute and resolving radiation sickness. The symptoms of the radiation sickness have now reached a plateau in the form of disabling headaches, nausea, diarrhea and weakness. (George Whalen, M.D.) Upon his return to the United States, plaintiff continued under the employ of Brown & Root until he initiated this lawsuit in June of 1982. Although he has since been employed for short periods of time, Mr. Zernicek, now 34 years of age, is currently unemployed.

## CONCLUSIONS OF LAW

### *Foreign Sovereign Immunity*

Passed in 1976, the FSIA codified the restrictive theory of sovereign immunity and attempted to provide a uniform statutory procedure for establishing subject matter and personal jurisdiction over foreign sovereign entities. *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 485, 103 S.Ct. 1962, 1967, 76 L.Ed.2d 81 (1983); *Vencedora Oceanico Navigacion v. Compagnie Nationale Algerienni de Navigation,* 730 F.2d 195 at 198, *reh'g en banc denied,* 734 F.2d 1479 (5th Cir.1984). *See generally,* H.R.Rep. No. 94–1487, 94th Cong., 2d Sess., reprinted in 1976 U.S.Code Cong. & Ad.News 6604 (hereinafter "H.R. Rep.").

2. CCC is a private Mexican business organization owned 49% by Brown & Root and 51% by Corporation de Industrius y Construcciones S.A. C.V., another private Mexican business organization which in turn is owned by an individual unrelated to Pemex. (Deposition of Patrick Hays at 20).

The FSIA [3] grants sovereign immunity to foreign states,[4] their agencies and instrumentalities, except as provided by the Act.[5] There is personal jurisdiction when foreign states are served with adequate notice as specified in the Act [6] and when subject matter jurisdiction is present. 28 U.S.C. § 1330(b) (1977). Under section 1330(a), subject matter jurisdiction is present whenever the foreign state enjoys no immunity from the claim as provided in sections 1605–1607, the listed exceptions to immunity. These exceptions establish in certain specified types of cases the necessary contacts that must exist before United States courts can exercise jurisdiction.

Plaintiff argues that the district court has jurisdiction under section 1605(a)(1), the "waiver" clause, providing for jurisdiction over certain cases in which the foreign state "has waived its immunity either explicitly or by implication," and under section 1605(a)(2), clause three, providing for jurisdiction over certain cases relating to the commercial activities of a foreign state. The Court now turns to these sections, noting that the party claiming FSIA immunity, in this instance Pemex, bears the burden of proving their nonapplicability. *Vencedora Oceanico Navigacion,* 730 F.2d at 199; *Arango v. Guzman Travel Advisors Corp.,* 621 F.2d 1371, 1378 (5th Cir.1980).

*Section 1605(a)(1)*

Plaintiff first argues that the Court should find subject matter jurisdiction under 1605(a)(1). Section 1605(a)(1) provides in relevant part:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
>
> (1) in which the foreign state has waived its immunity either explicitly or by implication ...

28 U.S.C. § 1605(a)(1).

Plaintiff contends that Pemex implicitly, if not explicitly, waived its sovereign immunity. This waiver is evidenced, in his view, because Pemex gave express consent to CCC to enter into any required subcontracts with Brown & Root (Appendix A at 2); and because pursuant to that consent clause, CCC agreed with Brown & Root that the law of the State of Texas would govern and control any claims based upon the acts or omissions of the parties. (Appendix B at 4). According to plaintiff, his viewpoint that the 28 U.S.C. § 1605(a)(1) exception applies is supported by the following legislative history of the Act:

> With respect to implicit waivers, the courts have found such waivers where a foreign state has agreed ... that the law of a particular country should govern a contract.

H.R. Report, *supra,* at 6617.

Further, plaintiff argues that CCC was a sham corporation, a "straw-man", created and organized in an attempt to shield Pemex from liability or jurisdiction of the United States courts, and that such interposition resulted in circumvention of the Act by Pemex. *Citing Anderson v. Abbott,* 321 U.S. 349, 64 S.Ct. 531, 88 L.Ed. 793, *reh'g denied,* 321 U.S. 804, 64 S.Ct. 845, 88

3. The provision conferring jurisdiction in the Act, 28 U.S.C. § 1330(a), creates in district courts:

> original jurisdiction without regard to amount in controversy of any non-jury civil action against a foreign state as defined in Section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under Sections 1605–1607 of this title or under any applicable international agreement.

4. The parties agree that Mexico is a foreign state and that Pemex is an agency or instrumentality of such state within the meaning of the FSIA. It is also agreed that Pemex is engaged in commercial activity outside the territory of the United States.

5. The general grant of foreign sovereign immunity in the FSIA provides:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act, a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in Sections 1605 to 1607 of this chapter.

28 U.S.C. § 1604.

6. Service of adequate notice is also not at issue.

L.Ed. 1090 (1944) and *Edwards Co., Inc. v. Monogram Indus., Inc.,* 713 F.2d 139 (5th Cir.1983), *reh'g en banc,* 730 F.2d 977 (5th Cir.1984), plaintiff asserts that the interposition of a corporation will not be allowed to defeat a legislative policy, whether that was the aim or only the result of the arrangement; and that the paramount policy here to be protected vis a vis the FSIA is the welfare of the United States citizens who are deliberately subjected to a known danger by Pemex.

The legislative history of the FSIA gives three examples of cases in which courts have found implied waivers: (1) a foreign state has agreed to arbitration in another country; (2) a foreign state has agreed that a contract is governed by the law of a particular country; and (3) a foreign state has filed a responsive pleading in a case without raising the defense of sovereign immunity. H.R. Report, *supra,* at 6617. Since the FSIA became law, courts have been reluctant to stray beyond these examples when considering claims that a nation has implicitly waived its defense of sovereign immunity. *Frolova v. Union of Soviet Socialist Republics,* 761 F.2d 370, 377 (7th Cir.1985).

Cases involving arbitration clauses illustrate that provisions allegedly waiving sovereign immunity are narrowly construed. Courts have found an implicit waiver under section 1605(a)(1) in cases involving contracts in which a foreign state has agreed to arbitrate disputes without specifying jurisdiction in a particular country. *See, e.g., Birch Shipping Corp. v. Embassy of United Republic of Tanzania,* 507 F.Supp. 311, 312 (D.D.C.1980); or where another nation has stipulated that American law should govern any contractual disputes, *see Resources Dynamics Int'l, Ltd. v. General People's Comm.,* 593 F.Supp. 572, 575 (N.D.Ga.1984). But most courts have refused to find an implicit waiver of immunity to suit in American courts from a contract clause providing for arbitration in a country other than the United States. *Frolova,* 761 F.2d at 372.

Another indication that the implicit waiver clause of section 1605(a)(1) is narrowly construed is the line of cases holding that a country's waiver of immunity does not apply to third parties not privy to the contract. *See Keller v. Transportes Aereos Militares Ecuadorianis,* 601 F.Supp. 787, 788–89 (D.D.C.1985); *Ohntrup v. Firearms Center, Inc.,* 516 F.Supp. 1281, 1285 (E.D.Pa.1981). Thus courts rarely find that a nation has waived its sovereign immunity, particularly with suits brought by third parties, without strong evidence that this is what the foreign state intended. *See Maritime Int'l Nominees Establishment v. Republic of Guinea,* 693 F.2d 1094, 1100 n. 10 (D.C.Cir.1982) (Congress contemplated waivers of a much more specific and explicit nature than the one constructed by plaintiff), *cert. denied,* — U.S. —, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983). *Castro v. Saudi Arabia,* 510 F.Supp. 309, 312 (W.D.Tex.1980) (there must be intentional and knowing relinquishment of sovereign immunity defense) *citing Mitchell v. Aetna Casualty & Surety Co.,* 579 F.2d 342, 347 (5th Cir.1978).

In the case at bar, Pemex executed a written contract with CCC under which CCC was to provide equipment and perform construction services for Pemex in the Bay of Campeche. (Plaintiff's Exhibit No. 13). CCC subcontracted significant portions of the work to Brown & Root (Plaintiff's Exhibits Nos. 14 and 15). Brown & Root employed plaintiff. Pemex knew that CCC would in all probability use Brown & Root as its subcontractor. (Plaintiff's Exhibit No. 13). Brown & Root knew that Pemex was the owner of the project on which Brown & Root would be working. (Plaintiff's Exhibits Nos. 14 and 15). The Pemex-CCC contract specifies that Mexican law will apply and that Mexican courts will have exclusive jurisdiction of any Pemex-CCC disputes. (Appendix A at 8). The CCC-Brown & Root contract specifies that United States law will apply and that United States courts will have jurisdiction with respect to any Brown & Root-CCC disputes. (Appendix B at 4). There is no provision in any contract under which Pe-

mex purports to agree that United States laws will be applicable or that United States courts will have jurisdiction. Moreover, upon a close reading of the contracts, it is evident that Brown & Root was aware that they must be specific as to Pemex in their contract with CCC if they expected Pemex to be contractually bound. (*See* Appendix B). On the basis of these facts, it is clear that Pemex neither explicitly nor implicitly waived its immunity from suit in the United States with respect to the plaintiff's claim.

Further, it is the Court's view that plaintiff's "strawman" theory must fail, as there is no evidence that CCC was a "strawman" which can be disregarded for purposes of determining jurisdiction under the FSIA. There is no evidence that CCC was organized for an improper motive; rather, the record is clear that CCC's existence was essential in order for Pemex to comply with applicable Mexican law which obligated Pemex to contract with Mexican business entities. (Deposition of Mr. Victor Rubio at 27). There is nothing to suggest that CCC failed to maintain a corporate identity separate from Brown & Root or that Brown & Root effectively controlled the business affairs of CCC. Although plaintiff offered testimony that most of the construction workers were North Americans, plaintiff, Robert Browning and Victor Valdez all testified that there were numerous Mexican nationals engaged in the construction work. Moreover, given the fact that Pemex was completely unrelated to CCC, there exists no confusion of identity or ambiguity as to the separateness of CCC and Pemex as is required in *Edwards* and *Abbott.*

█ Finally, case law clearly establishes that the focus of analysis for determining whether a foreign sovereign has impliedly waived its immunity must be on the acts of the foreign sovereign, not others. *See Maritime Int'l. Nominees Establishment v. Republic of Guinea,* 693 F.2d at 1102; *Transam. S.S. Corp. v. Somali Democratic Republic,* 590 F.Supp. 968, 974 (D.D.C. 1984). In the opinion of this Court, there is nothing in the record to suggest that Pemex consented to being bound by foreign law or being subject to proceedings in a foreign forum.

*Section 1605(a)(2)*

█ Plaintiff argues next that the Court should find subject matter jurisdiction under the third clause of 1605(a)(2). Section 1605(a)(2) provides in relevant part:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
>
> > (2) in which the action is based upon ... an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States ...

28 U.S.C. § 1605(a)(2).

Plaintiff contends that as a result of the radiation sickness suffered by him and induced by Pemex's acts in the Bay of Campeche, he has suffered direct effects of radiation exposure while in the United States between tours of Bay of Campeche duty (during the period of April 1981 through April 1982). This is so, according to plaintiff, because radiation sickness is an ongoing malady which affects the cell growth in the human body. Moreover, plaintiff asserts that because of the nature of his ailment, the ongoing direct effects of the radiation exposure have manifested themselves, in the first instance and for the first time, here in the United States, constituting a "direct effect" in the United States as that term is understood under the FSIA.

Case law dealing with the "direct effect" issue in the context of a personal injury claim based on activity occurring outside the United States has consistently held that subsequent receipt of medical attention and the lingering effects of the injury after the claimant has returned to the United States does not satisfy the "direct effect" requirement. *Yugoexport, Inc. v. Thai Airways Int'l., Ltd.,* 749 F.2d 1373, 1375 (9th Cir. 1984) (either an injury or an act must occur in the United States for jurisdiction to ex-

ist), *cert. denied,* — U.S. —, 105 S.Ct. 2326, 85 L.Ed.2d 844 (1985); *Berkovitz v. Islamic Republic of Iran,* 735 F.2d 329, 332 (9th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 510, 83 L.Ed.2d 401 (1984) (death of American in political violence in Iran did not have sufficient direct effect in the United States); *Close v. Am. Airlines, Inc.,* 587 F.Supp. 1062, 1065 (S.D.N.Y.1984); *Harris v. VAO Intourist,* 481 F.Supp. 1056 (E.D. N.Y.1979); *Upton v. Empire of Iran,* 459 F.Supp. 264, 266 (D.D.C.1978), *aff'd mem.,* 607 F.2d 494 (D.C.Cir.1979). In short, courts have uniformly held that a personal injury suffered outside the United States does not form a basis for jurisdiction under the third clause, even if the injury lingers after the plaintiff returns to the United States.

The decision in *Close* is most directly applicable to this case. In *Close,* the plaintiff, a citizen of Connecticut, was injured at an airport in Jamaica when jet wash from an airplane knocked her down. She incurred medical expenses and was disabled from continuing her occupation. The court held that the economic impact of her injuries in the United States and her disability in the United States did not constitute a "direct effect" under the third clause of 28 U.S.C. § 1605(a)(2). Accordingly, the complaint was dismissed for want of jurisdiction. Nonetheless, the plaintiff in the case *sub judice* seeks to distinguish the overwhelming weight of case authority by urging that the effects of radiation exposure are not manifest for a long period of time after the exposure. In the Court's view, this theory, though creative and novel, raises a distinction without a difference.

The acts of Pemex about which plaintiff complains are alleged failures by Pemex adequately to supervise Rayos X. Plaintiff was exposed to radiation only at the jobsite in the Bay of Campeche. He became ill at that location. He received medical treatment in Mexico. He returned to the United States where he received and does receive additional medical treatment. Accordingly, the distinction proffered by plaintiff simply demonstrates that plaintiff's claimed "direct effect" is just as obscure, uncertain and indirect as was the case in *Close* and affords no basis for altering the analysis or results in the prevailing case law. Accordingly, the court concludes that plaintiff's claim of jurisdiction under the third clause of section 1605(a)(2) must fail.

*Conclusion*

Having considered both theories offered by plaintiff to support his claim of jurisdiction over the defendant, Pemex, the Court is of the view that neither may succeed. Consequently, the Court concludes that Pemex enjoys sovereign immunity as a matter of law, which immunity bars this action as to it. Accordingly, defendant Pemex's motion to dismiss is granted.[7]

In the event that any of the foregoing Findings of Fact constitute Conclusions of Law, they are adopted as such. In the event that any of the foregoing Conclusions of Law constitute Findings of Fact, they are adopted as such.

The defendant is directed to submit a final judgment incorporating by reference the Court's Findings of Fact and Conclusions of Law within twenty (20) days of receipt hereof.

APPENDIX A

The general contract as executed by Pemex and CCC provided, in relevant part, that:

1. PEMEX * and the CONTRACTOR [CCC] declare that they acknowledge and accept the partial subcontracting of the works which are the subject of this Contract, with the DESIGNATED SUBCONTRACTOR [Brown & Root]. (Plaintiff's Exhibit 13, at 2).
2. TWO—SUBCONTRACTING

   PEMEX ... gives its express consent so that the CONTRACTOR may sub-

7. Having determined that no legal basis for *in personam* on subject matter jurisdiction exists as to defendant Pemex, the Court need not reach the other substantive issues in this action as to it.

contract a partial or total rendering of the works and/or services agreed upon with the DESIGNATED SUBCONTRACTOR. Thus, said CONTRACTOR shall be authorized to enter into all contracts required with said DESIGNATED SUBCONTRACTOR in order to carry out the aforementioned subcontracting. (*Id.* at 3).

3. THREE—LIABILITY

   Independently of the agreement stipulated in the previous clause, the CONTRACTOR ... acknowledges and accepts that he shall be solely and directly responsible before PEMEX for ... fulfilling each and every one of the stipulations contained in this Contract. (*Id.*).

4. FOUR—AMOUNT OF WORKS AND SERVICES

   PEMEX shall pay the DESIGNATED SUBCONTRACTOR ... in U.S. dollars, directly at the bank appointed by the DESIGNATED SUBCONTRACTOR ... (*Id.* at 4).

5. SIX—PROGRAM

   PEMEX shall at all times hereunder have the right to make changes in the work and/or services ... (*Id.* at 5).

6. ELEVEN—SUPERVISION OF WORK AND/OR SERVICES

   PEMEX ... shall be entitled to supervise, at all times, the quarters services covered hereunder ... The CONTRACTOR is required to have at the job site an expert representing said CONTRACTOR ... previously accepted by PEMEX. (*Id.* at 8).

7. TWENTY-ONE—SUBCONTRACTING

   For the purposes of this Contract, the term "subcontracting" shall refer to an act whereby the CONTRACTOR entrusts to another company the total or partial performance of the work and/or services, subject of the Contract.

   In any case of subcontracting, the CONTRACTOR shall be responsible for the performance of the Works and/or services. (*Id.* at 16).

8. TWENTY-FIVE—CONCILIATION AND APPLICABLE LAWS

   If any discrepancy should arise with respect to the interpretation of non-fulfillment of the rights and/or obligations established in this Contract, ... either party may resort to the Federal Courts of Mexico City, Federal District, to the jurisdiction whereof the parties submit expressly, waiving any other. (*Id.* at 19, 20).

* Within the three relevant contracts and subcontracts, PEMEX is referred to as "Owner", CCC as "Contractor"; and Brown & Root as "Subcontractor".

## APPENDIX B

The Subcontract, as executed by CCC and Brown & Root, Inc., in 1981 and 1982 are virtually identical and provide in relevant part that:

1. COMMENCEMENT OF THE WORK

   Subcontractor agrees to commence the Sublet Work in accordance with the General Contract ... (Plaintiff's Exhibits Nos. 14 and 15 at 3).

2. APPLICABILITY OF GENERAL CONTRACT

   General Contractor shall provide Subcontractor with the General Contract terms governing the Sublet Work. Subcontractor agrees to perform the Sublet Work in accordance with such terms so far as applicable to the Sublet Work. General Contractor shall be bound to the Subcontractor by all of the obligations that the Owner assumes to the General Contractor under the General Contract and by all the provisions thereof affording remedies and redress to the General Contractor from the Owner, except as otherwise expressly provided herein. Subcontractor shall have an opportunity to be present and to submit evidence in any arbitration or other proceeding involving its rights, provided such is agreeable to the Owner. Subcontractor shall make any claim for extras, request for extensions of time and claim for damages or otherwise, authorized by this Subcontract and give any no-

tices provided for in the General Contract or in this Subcontract to the General Contractor in the manner provided in the General Contract for like claims ... (*Id.* at 5, 6).

3. QUALITY OF THE WORK AND LIABILITY
Subcontractor shall perform the Sublet Work in accordance with good professional practices and with due skill, diligence and care normally employed by reputable and comparable international organizations subject to the terms of the General Contract and this Subcontract. (Plaintiff's Exhibit No. 14 at 9; Plaintiff's Exhibit No. 15 at 8).

4. GOVERNING LAW
It is agreed by and between the parties hereto for themselves and all persons claiming under them that the laws of the State of Texas, United States of America, shall be the laws applicable to the interpretation of this Subcontract and such laws shall govern and be followed in the construction and interpretation of all of its terms. It is also agreed that all acts or omissions of the parties occurring within the course and scope of the performance of this Subcontract shall be governed and controlled by the laws of the State of Texas, United States of America, and that accordingly, the respective rights and liabilities of the parties both in tort and in contract with relation to all such acts or omissions shall be governed by the laws of the State of Texas ... (Plaintiff's Exhibit No. 14 at 13; Plaintiff's Exhibit No. 15 at 11).

5. POLLUTION CONTROL
General Contractor shall use its best efforts to include, in each General Contract entered into between Owner and General Contractor which calls for Sublet Work to be offered to Subcontractor, a clause covering pollution, which clause shall be identical to or substantially follow the language contained in the draft attached hereto ... (Plaintiff's Exhibit No. 14 at 19; Plaintiff's Exhibit No. 15 at 16).

6. TAXES
General Contractor shall use its best efforts to have a clause inserted in the General Contract in each case which is identical to or substantially similar to the clause contained in the draft attached hereto ... (Plaintiff's Exhibit No. 14 at 19).

7. SUBCONTRACTOR AS "INDEPENDENT CONTRACTOR"
In the performance of the Sublet Work the Subcontractor is an independent contractor with the right to supervise, manage and control the performance of the details thereof, General Contractor and Owner being interested only in the results of the same and being entitled to inspect the performance of the Sublet Work by Subcontractor only to the extent necessary to assure such results. (Plaintiff's Exhibit No. 14 at 20; Plaintiff's Exhibit No. 15 at 16).